UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JOEL UVILES, *on behalf of himself and all others similarly situated*,

                     Plaintiff,

    — against —

THE CITY OF NEW YORK and ANTHONY J. ANNUCCI, Acting Commissioner for the New York State Department of Corrections and Community Supervision, *in his official capacity*,

                     Defendants.

---

Index No. 19-CV-3911

**MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .........................................................................................................4

    I.    Mr. Uviles's Criminal Case .........................................................................................4

    II.    The City of New York's Parole Warrant Policy ...........................................................8

    III.    The City of New York Routinely Tracks Inmates' Parole Warrant Information ...........9

    IV.    The State of New York's Policies and Practices Cause Unconstitutional Detention on Parole Warrants .............................................................................................................10

LEGAL STANDARD ...............................................................................................................13

ARGUMENT ...........................................................................................................................14

    I.    The City of New York's Policy Caused Mr. Uviles's Constitutional Injuries .................14

        A.    No Law Required the City to Hold Mr. Uviles on a Legally Invalid Parole Warrant...15

        B.    The Warrant Was Executed When It Was Lodged as a Detainer With NYCDOC.......18

    II.    The State of New York's Policy Caused Mr. Uviles's Injuries and Will Harm Others Like Him in the Future if the State Is Not Enjoined .....................................................................21

        A.    The Lack of Policies Requiring the Board of Parole to Act with Reasonable Diligence Upon a Cancelation Request Caused Mr. Uviles and People Like Him to Be Detained ......21

        B.    The State's Paper-Based and Slow Process for Release Caused Mr. Uviles and Others Like Him to be Overdetained. ...............................................................................................23

        C.    Mr. Uviles's Case Is Not Moot......................................................................................24

CONCLUSION .........................................................................................................................25

# TABLE OF AUTHORITIES

Cases

**Page(s)**

*Amador v. Andrews,*
655 F.3d 89 (2d Cir. 2011) ................................................................ 24

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ........................................................................... 15

*Armstrong v. Squadrito,*
152 F.3d 564 (7th Cir. 1998) .............................................................. 19

*Barnes v. District of Columbia,*
793 F. Supp. 2d 260 (D.D.C. 2011) ................................................... 24

*Board of Cty. Comm'rs of Bryan Cty., v. Brown,*
520 U.S. 397 (1997) ........................................................................... 23

*Caldarola v. Calabrese,*
298 F.3d 156 (2d Cir. 2002) ............................................................... 15

*Francis v. City of N.Y., No.*
17 Civ. 1453 , 2018 U.S. Dist. LEXIS 143020 (S.D.N.Y. Aug. 21, 2018) ................. 23

*Gayle v. Gonyea,*
313 F.3d 677 (2d Cir. 2002) ............................................................... 15

*Gonzalez v. State of New York,*
165 A.D.3d 763 (2d Dep't 2018) ........................................................ 24

*Hayes v. Faulkner County,*
388 F.3d 669 (8th Cir. 2004) .............................................................. 19

*Lynch v. City of New York,*
335 F. Supp. 3d 645 (S.D.N.Y. 2018) ................................................ 24

*Marvel Characters, Inc. v. Simon,*
310 F.3d 280 (2d Cir. 2002) ............................................................... 15

*McDay v. Travis,*
303 F. App'x 928 (2d Cir. 2008) ...............................................*passim*

*Monell v. Department of Social Services of the City of New York,*
436 U.S. 658 (1978) ........................................................................... 16

*Moody v. Daggett,*
429 U.S. 78 (1976) ............................................................................. 21

*Niagara Mohawk Power Corp. v. Jones Chem., Inc.,*
315 F.3d 171 (2d Cir. 2003) ............................................................... 15

*Oviatt v. Pearce,*
954 F.2d 1470 (9th Cir. 1992) ............................................................ 19

*People ex rel Willis v. Travis,*
680 N.Y.S.2d 422 (Sup. Ct. Nassau Cnty 1998) ............................... 18

*People ex rel. Brown v. N.Y. State Bd. of Parole,*
139 A.D.2d 548 (2d Dep't 1988) ....................................................... 21

*People ex rel. Brown v. N.Y. State Div. of Parole,*
70 N.Y.2d 391 (1987) ........................................................................ 20

*People ex rel. Gonzales v. Dalsheim,*
52 N.Y.2d 9 (1980) ...................................................................... 20,21

*People ex rel. Johnson v. N.Y. State Div. of Parole*,
    148 A.D.2d 401 (1st Dep't 1989) ................................................................. 18
*People ex rel. Levy v. Dalsheim*,
    411 N.Y.S.2d 343 (2d Dep't 1978) ............................................................. 18
*People ex rel. Matthews v. N.Y. State Div. of Parole*,
    95 N.Y.2d 640 (2001) ............................................................................. 20,21
*People ex rel. Patterson v. Warden, Rikers Island Corr. Facility*,
    36 Misc. 3d 1235(A) (Sup. Ct. Bronx Cnty 2012) ................................... 21
*People of the N.Y. ex rel. Joelle B. Ryu v. Cynthia Brann, No. 400074-2020*,
    2020 N.Y. Misc. LEXIS 7567 (Sup. Ct. Bronx. Cnty May 15, 2020) ......... 24
*Sosna v. Iowa*,
    419 U.S. 393 (1975) ............................................................................... 25,26
*Torraco v. Port Auth. of N.Y. & N.J.*,
    615 F.3d 129 (2d Cir. 2010) ...................................................................... 16,17
*Vega v. Semple*,
    963 F.3d 259 (2d Cir. 2020) ......................................................................... 25
*Windley v. N.Y. State Div. of Parole*,
    273 A.D.2d 317 (2d Dep't 2000) ................................................................. 20

**Statutes**
18 U.S.C. §§ 4205 ......................................................................................... 21
42 U.S.C. § 1983 ............................................................................................. 4
N.Y. Exec. Law § 259-i ............................................................................. *passim*
Section 259-i of the Executive Law ............................................................ 17

**Rules**
Fed. R. Civ. P. 56 ......................................................................................... 15
Federal Rule of Civil Procedure 26 .............................................................. 8
Federal Rule of Civil Procedure 30 .............................................................. 13

**Other**
N.Y. Comp. Codes R. & Regs. Tit 8004.3 ................................................... 14

## PRELIMINARY STATEMENT

Both the City and State of New York maintain separate but synergistic, unconstitutional policies and practices that caused Plaintiff Joel Uviles's unlawful detention at Rikers Island in June 2018.  Together, those policies and practices caused Mr. Uviles, and many like him, to be imprisoned without lawful basis in New York City correctional facilities.

The City's unconstitutional policy is to imprison parolees on invalid parole warrants until the State tells the City the warrant has been "lifted."  The City does this even where it knows the warrant is legally void, as it did in this case.  The City knows that parole warrants become legally void when the State does not provide the notice and/or hearing required by state law.  The City knows it cannot detain parolees on legally invalid parole warrants because the United States Court of Appeals for the Second Circuit has told it so.  *McDay v. Travis*, 303 F. App'x 928, 929-32 (2d Cir. 2008).  ("If these requirements are not timely met, the parole warrant is rendered void, and the *prisoner is entitled to be released* … [A]ny parole warrant in the City's possession *ceased to be 'facially valid'* … after plaintiff was not afforded a probable cause hearing within fifteen days of its issuance.") (emphasis added).  The court *in McDay* noted that the City's reported policy of waiting to be told to release an inmate held on an invalid warrant "might prove to be grounds for the City's liability under 42 U.S.C. § 1983."  *Id.* at 931.  Yet the City admits it has not changed its policies since then.  The City's Rule 30(b)(6) representative testified that, irrespective of whether the requisite notice and hearing have been provided, the City will not release a parolee until the State or a court tells it to.  That is exactly what the Second Circuit in *McDay* told the City it cannot do.

Given that the City indisputably maintains this policy, the only relevant question is whether the City's policy caused Mr. Uviles to be unconstitutionally detained.  It did.  The

1

City was aware that Mr. Uviles was entitled to release once he paid bail on his pending case (which was ultimately dismissed).  Mr. Uviles had repeatedly made the City aware of his right to be released – personally, through his family, and through his attorney.  Moreover, the City's tracking system for inmates, the Inmate Information System ("IIS"), tracks when inmates are held on a parole warrant and if or when their parole revocation hearings have occurred.  The City knows whether a parolee is being held pursuant to a parole warrant that has been rendered void because the legal requirements for detention have not been met.  The math for determining the difference between when the warrant is lodged and fifteen days beyond that number is straightforward; Defendants produced a spreadsheet to Plaintiff in this litigation that allows precisely that calculation, and other circuits have noted that these kinds of calculations must be made by jailers.

   If the City is aware that an inmate's parole warrant becomes void, it can and must release the inmate.  New York State law is clear that when a preliminary parole revocation hearing is not timely provided, a parolee is *entitled* to their release.  As such, when the City is aware that an inmate is entitled to their release, as in Mr. Uviles's case, it is required to release him.  Because the City's policy is to delegate that decision to the State, even where it knows continued detention is unlawful, it maintains a policy that caused Mr. Uviles – and many others – to be unconstitutionally detained.

   The State of New York's policy, as maintained by Defendant Anthony J. Annucci, who is sued only in his official capacity pursuant to *Ex Parte Young*, is that even when a New York State Department of Correction and Community Supervision ("DOCCS") employee has determined that a parole warrant is void – for example, as here, for failure to provide the

legally required notice and hearing – the State engages in an unhurried, bureaucratic process that causes unlawful detention to go on for days, weeks, or more.

The State has no written procedures or requirement that the Board of Parole address a parole warrant cancellation request within any given time frame.  In this case, despite a parole officer's determination on June 7, 2018, that Mr. Uviles's parole warrant and revocation were void for both lack of notice and a preliminary hearing, the New York City Department of Correction ("NYCDOC") did not receive a cancelation of his delinquency lifting the parole warrant until June 29, 2018.  The reason for that delinquency, as given to his then-attorney, was that there was a "paperwork" mix-up and that the person responsible for Mr. Uviles's cancelation was "on vacation."

The State's internal policies dictate to its employees that even where procedural requirements to maintain a parole warrant have not been met or provided, a parole warrant remains in effect until members of the Board of Parole see fit to "cancel" the warrant.  The State's written laws and regulation contain no such administrative requirement, but the State's policy remains that once a parole warrant has been created, the warrant must be treated as valid – even where it has become void as a matter of law – until members of the Board of Parole agree to cancel it.

The State's policy and parole system, in which the State causes parolees to be detained on parole warrants that are known to be void for failure to provide notice and a hearing, absent personal cancelation by a member of the Board of Parole, cause constitutional violations with regularity.  So to do the State's long delays in processing parole warrant "cancellations." The requirement that members of the Board of Parole formally "cancel" already invalid warrants, the absence of any time limit on the "cancellation" process, and the use of a paper- and fax-based

system for addressing cancelation requests in a digital age, all contributed to Mr. Uviles's

prolonged detention and will contribute to the overdetention of those like him if not enjoined.

## STATEMENT OF FACTS

**I.      Mr. Uviles's Criminal Case**

Plaintiff Joel Uviles was arrested on May 22, 2018, as a result of false allegations

made against him.  The charges initially contained felony counts, but the felony counts were

quickly dropped.  (*See* Rule 56.1 Statement of Undisputed Material Facts ("UMF") ¶¶ 1-2; Ex. 5

(Declaration of Scott Hechinger ("Hechinger Decl.")) ¶ 3.)  A Brooklyn judge set bail of $2,500

on May 25, 2018.  (*Id.*; *see also* Ex. 14 (Accompanying Card and Bail Receipt) at CNY 0003.)

Mr. Uviles did not pay bail that day.[1]  (UMF ¶¶1-2; Ex. 5 (Hechinger Decl.) ¶ 5; *see also* Ex. 14

(Accompanying Card and Bail Receipt) at CNY 0001-07.)  After Mr. Uviles's arrest, he was first

detained at the Brooklyn House of Detention, before eventually being taken to Rikers Island and

held in custody by NYCDOC.  (*See* Ex. 8 (IIS) at CNY 00013.)

At some point that same day after Mr. Uviles's arrest, a senior parole officer at

DOCCS created a parole warrant for Mr. Uviles, and Parole Officer Johnny Ortiz emailed the

parole warrant to an officer in the 18th Precinct and to New York "pre-arraignments."  (UMF ¶ 3;

Ex. 7 (Parole Warrant); Ex. 6 (CHRONOS) at ANNUCCI 020.)  A copy of the warrant was also

delivered to Senior Police Administrative Aide Joanna Pirkle on May 23, 2018.  (UMF ¶ 3; Ex. 6

(CHRONOS) at ANNUCCI 019.)  Information regarding the existence of the parole warrant was

also made part of Mr. Uviles's "Accompanying Card" when he was admitted to Rikers Island.

(UMF ¶ 3; Ex. 14 (Accompanying Card and Bail Receipt) at CNY 0006-07.)  Such information

---

1. All charges were eventually dropped against Mr. Uviles in late 2018.

was additionally lodged into the City's IIS, which tracks when warrants and detainers are lodged and lifted.  (Ex. 8 (IIS) at CNY 00014.)

Mr. Uviles's supervising parole officer testified that the typical practice is to send electronic copies of the parole warrant to police officers at "central bookings" to ensure that they are aware a parole warrant has been issued, and then, if an inmate is transferred to Rikers Island, to deliver a hard copy of the warrant itself to maintain the detention in the event that bail is paid. (*See* Ex. 3 (Hogan Dep. Tr.) at 32:15-36:17.)  Neither Mr. Uviles's parole officer Legenda von Evans nor the supervising parole officer Gwendolyn Hogan delivered the warrant to NYCDOC, and no record of delivery is noted in the CHRONOS database, DOCCS's internal system for tracking parolees.  (UMF ¶ 4; *See* Ex. 6 (CHRONOS).)  NYCDOC did not produce a copy of the warrant in its Federal Rule of Civil Procedure 26(a) disclosures or in response to Plaintiff's discovery requests.

Further, Mr. Uviles was never served with parole violation papers or a notice of a preliminary hearing or provided the preliminary hearing itself.  (UMF ¶ 4; Ex. 2 (Von Evans Dep. Tr.) at 21:16-22:6.)  In fact, on June 7, 2018, Mr. Uviles's parole officer made an entry in CHRONOS stating that "bureau analysis was submitted cancelling delinquency due to untimely service.  The analysis was emailed to Barbara Felder to be submitted to the Commissioner's office."  (UMF ¶ 6; Ex. 6 (CHRONOS) at ANNUCCI 017.)  The cancelation of delinquency itself read:

> Mr. Joel Uviles was arrested by NYPD on 5/22/18 and he was charged with Assault 3rd Degree.  A warrant was issued by [a PO] that evening.  He was not served with the violation of release report within the required timeframe.  Therefore, we are submitting a cancelation of delinquency due to non-curable service defect.

(UMF ¶ 6; Ex. 12 (Cancelation Request) at ANNUCCI 002.)

5

Having determined that service was defective, on June 10, 2018, Mr. Uviles's parole officer Von Evans elected to visit him at Rikers Island and asked him to sign additional conditions of his parole, which he did.  (Ex. 2 (Von Evans Dep. Tr.) at 22:17-23:3; Ex. 6 (CHRONOS) at ANNUCCI 017.)  She told Mr. Uviles that she had already submitted the paperwork canceling the parole warrant and that he should pay bail because he would be free to leave.  (Ex. 4 (Uviles Dep. Tr.) at 37:24-39:5.)  She also removed the wanted posting for Mr. Uviles on the National Crime Information Center on June 12, 2018.  (Ex. 6 (CHRONOS) at ANNUCCI 017.)

Mr. Uviles had a criminal court hearing on June 11, 2018.  (UMF ¶ 5; Ex. 5 (Hechinger Decl.) ¶ 6; Ex. 14 (Accompanying Card and Bail Receipt) at CNY 0004.)  That day, he arranged for his family to pay bail, and believed he would be free to leave upon NYCDOC registering the payment.  (UMF ¶ 5; Ex. 4 (Uviles Dep. Tr.) at 28:3-4.)[2]  They paid bail that day, which entitled him to his release, although the bail payment receipt was not received until June 12, 2018.  (UMF ¶ 5; Ex. 14 (Accompanying Card and Bail Receipt) at CNY 0006-07.)  From that point onward, Mr. Uviles was being held on an invalid parole warrant.

Over the course of the next two and a half weeks, Mr. Uviles, his family, and his attorney agitated for his release.  Mr. Uviles himself told everyone at Rikers he was entitled to his release as of June 11, 2018.  (UMF ¶ 7; Ex. 4 (Uviles Dep. Tr.) at 57:1-61:21.)  His family members called 311 and called and stopped by the parole office to advocate for him to be released.  (*Id*.; *See also* Ex. 6 (CHRONOS) at ANNUCCI 015.)  His then-attorney Scott

---

2. Mr. Uviles seems to have been under the mistaken impression that the charges were reduced the day of the June 11, 2018 court hearing, but that appears not to have been the case.  The charges were reduced much earlier, and bail was set at the lower amount on May 25, 2018.  According to Mr. Uviles's then-attorney Scott Hechinger, bail was not paid *due to the parole hold*.  (Hechinger Decl. ¶ 5.)  Namely, he did not pay bail at that time given that the parole warrant was outstanding and he would therefore continue to be held.

Hechinger contacted and wrote to NYCDOC, DOCCS, and started a Twitter campaign to raise visibility on the issue.  (UMF ¶ 7; Ex. 5 (Hechinger Decl.) ¶¶ 7-19.)

On June 20, 2018, after numerous contacts from Mr. Uviles, his lawyer, and his family, Ms. Von Evans asked Ms. Hogan how to expedite Mr. Uviles's release.  (UMF ¶ 7; Ex. 2 (Von Evans Dep. Tr.) at 30:8-21; Ex. 6 (CHRONOS) at ANNUCCI 016.)  She was informed there was nothing to do, due to the "Warrant Lift Status," namely that they had already sought to cancel Mr. Uviles's warrant two weeks prior.  (UMF ¶ 7; Ex. 6 (CHRONOS) at ANNUCCI 016.)  As of June 25, 2018, no Board of Parole member had taken action on Mr. Uviles's parole warrant, and Mr. Uviles again called wanting to know why he had not been released.  (*Id*. at ANNUCCI 015.)  Mr. Hechinger called and emailed both NYCDOC and DOCCS.  (UMF  7; Ex. 5 (Hechinger Decl.) ¶¶ 8-16.)

One June 26, 2018, Ms. Von Evans was instructed to return a violation of parole "VOP package" (Ex. 6 (CHRONOS) at ANNUCCI 015; Ex. 2 (Von Evans Dep. Tr.) at 38:6-15.) On June 26, that package was submitted and sent to Barbara Felder of the Parole Violation Unit. (Ex. 6 (CHRONOS) at ANNUCCI 015.)  Finally, on June 29, 2018, the cancelation of the parole warrant was received from the Board of Parole.  Mr. Uviles's attorney, Mr. Hechinger, was told that five to seven days was the "typical" amount of time it took for a cancelation request to be addressed.  (UMF ¶ 13; Ex. 5 (Hechinger Decl.) ¶ 9.)  Ms. Hogan, the supervising parole officer, testified similarly, that it takes a week to ten days to get a decision back from the Board of Parole canceling the delinquency once submitted by a parole officer.  (Ex. 3 (Hogan Dep. Tr.) at 38:7-16.)  Mr. Hechinger was also informed by the Brooklyn Bureau Chief of the DOCCS Parole Office that the person who was required to act on Mr. Uviles's paperwork was on vacation.  (Ex. 5 (Hechinger Decl.) ¶¶ 14-18.)  Finally, on June 29, 2018, Mr. Uviles's warrant lift authorization

arrived back from the Board of Parole to his parole officer.  (UMF ¶ 15; *See* Ex. 13 (Warrant Lift).)  Unlike the warrant itself, the warrant lift then had to be hand delivered to Rikers Island. On the afternoon of June 29, 2018, Mr. Uviles's warrant lift was delivered to Rikers Island by Jacquelyn Hernandez.  (UMF ¶ 8; Ex. 6 (CHRONOS) at ANNUCCI 014.)

For Mr. Uviles, this meant that despite his parole officer determining that his warrant was void for failure to provide due process, and despite him not having a preliminary hearing nor anyone at DOCCS or NYCDOC believing one could or would be held, he was detained at Rikers Island eighteen days beyond the date on which he had paid bail.  Even on June 27, 2018, when Mr. Uviles was being held on an invalid parole warrant, as he had not and would not be provided with a preliminary hearing, it still took two days for Mr. Uviles's paperwork and "warrant lift" to be provided to Rikers Island to remove him from NYCDOC custody.

## II.    The City of New York's Parole Warrant Policy

NYCDOC's directives do not permit NYCDOC staff, at any time, to release an inmate held on a parole warrant unless they receive a parole warrant "lift" from the State or a court order granting release.  (UMF ¶ 9; *See* Ex. 1 (Monastero Dep. Tr.) at 15:25-17:24, 19:5-11, 28:11-29:5.)  Anthony Monastero, testified on behalf of the City that the City would not release an inmate under any other circumstances.  (*Id.*)  These written directives and Mr. Monastero's admission are alone sufficient to establish the existence of the City's policy of jailing parolees irrespective of the legality of a parole warrant.  But substantial other evidence demonstrates that the City will not release parolees unless instructed to by the State, regardless of the validity of the underlying parole warrant.

First, the City admitted that was its policy in *Travis v. McDay* in 2008.  In that case, the City submitted an affidavit stating that under the policy, "[a] parole warrant may only

8

be lifted in one of three ways: (a) the state parole officer physically goes to Rikers Island correctional facility to lift the warrant; (b) a Supreme Court order vacates or dismisses the warrant; or (c) the State of New York Division of Parole vacates the warrant by sending the warrant lift to [DOC]." *McDay*, 303 F. App'x at 930-31 (alterations in original).  In this action, in response to document requests demanding written policies and directives regarding the release of parolees held in NYCDOC custody, the City produced no written policies developed post-*McDay*.

The City did not change its policy even though the Second Circuit had indicated in *McDay* that the policy was "in apparent tension with state law, which explicitly denied the City authority to hold plaintiff on that basis after the warrant expired." *Id.* at 931.  Mr. Monastero was aware of no relevant written policies other than those produced to Plaintiff in this action and could not point to any policies that post-dated the *McDay* decision.  (UMF ¶ 9; Ex. 1 (Monastero Dep. Tr.) at 13:14-19.) Moreover, as Mr. Uviles testified, he was repeatedly told that he could not be released because there was a warrant lodged against him, consistent with the policy.  (UMF ¶ 9; Ex. 4 (Uviles Dep. Tr.) at 58:1-61:1.)  And consistent with the policy, only after receiving the warrant lift from the State on June 29, 2018 was Mr. Uviles released from custody.  (UMF ¶ 10; Ex. 8 (IIS) at CNY 00015.)

### III.    The City of New York Routinely Tracks Inmates' Parole Warrant Information

While Mr. Uviles himself made the City of New York fully aware of his right to be free from its custody, (*see* Ex. 4 (Uviles Dep. Tr.) at 58:8-61:1; Ex. 5 (Hechinger Decl.) ¶¶ 7-17), NYCDOC can and does track a vast amount of information that allows it to know exactly who in its custody may be overdetained and when they should be released regardless of the State's actions, (UMF ¶ 16-17; *see* Ex. 1 (Monastero Dep. Tr.) at 21:21-23:10).  NYCDOC

maintains a powerful database, the IIS, that tracks inmate information and court dates.  The IIS tracks when an inmate was brought into custody, the charges against them, their next court date, the reason(s) they are in custody, and whether any detainer or warrant is lodged against the inmate.  (UMF ¶ 16-17; *See* Ex. 8 (IIS); *see generally* Ex. 1 (Monastero Dep. Tr.) at 29:21-42:23.)

For example, on the "WD" screen – the warrants and detainers screen – NYCDOC tracked Mr. Uviles's type of warrant, the date it was lodged, whether he had had a parole violation hearing, and the date of any such hearing.  (*See* Ex. 8 (IIS).)  The City did not, but easily could, track whether he had been served with any notice of a hearing or papers underlying the hearing.  (UMF ¶ 11; *See* Ex. 1 (Monastero Dep. Tr.) at 21:21-23:10.)  When asked if the City crosschecks whether individuals have been detained for long periods of time on a parole warrant without a preliminary hearing, the City's Federal Rule of Civil Procedure 30(b)(6) witness testified that the City sometimes runs such checks, but not as a matter of course. (AUMF ¶ 11; *Id.*)  Instead, the City believes that that is solely the responsibility of parole, stating it is "not part of our job requirements" to know whether they have a legal justification to hold parolees in their custody.  (*Id.* at 23:2-10.)  Nonetheless, the City clearly can and does track the length of time individuals are incarcerated in their facilities without a judicial hearing.

**IV.    The State of New York's Policies and Practices Cause Unconstitutional Detention on Parole Warrants**

New York State has no official policy requiring its employees to ensure the release of parolees held on state parole warrants that have become void because of the state's failure to comply with state law.  Section 259-i of the New York Executive Law codifies the procedure due to a parolee who is subject to a potential revocation of his liberty interest in his parole.  The statute does not spell out the procedure for cancelation of a parole warrant.  Under

10

the regulations associated with Section 259-i, Section 8004.3 of the New York Codes, Rules and Regulations, the State provides the requirements for *how* to cancel a warrant prior to a final revocation hearing, but provides no requirements for *when* or *why* a warrant must be canceled by the Board of Parole consistent with constitutional requirements:

> Where a final revocation hearing has not yet commenced by the swearing of witnesses and the taking of testimony or evidence, delinquency may be cancelled and the warrant vacated by three members of the board or the administrative law judge, who shall state their reasons in writing for the cancellation at or before the time of the final hearing but prior to the swearing of witnesses and the taking of testimony or evidence.

N.Y. Comp. Codes R. & Regs. tit. 9 § 8004.3.

Beyond the legislative and regulatory requirements, DOCCS maintains internal directives to its employees regarding the cancelation of parole warrants. Under Directive 9050, which is the DOCCS internal directive governing the parole revocation process, a parole warrant may also be lifted in the following two ways:

> 1. The supervisor who issued a warrant or another supervisor may void a warrant provided the violation warrant has not been enforced and no delinquency action has been declared. The supervisor will provide the reasons the warrant was voided in a memorandum to the Bureau Chief, with copies to the case folder/record and the Community Supervision Central Office Files Unit, and will prepare and complete the Notice of Arrest/Warrant Issuance procedure.
>
> 2. After enforcement of a warrant, but prior to the Preliminary Hearing or waiver of such hearing, a Board Member may vacate a warrant upon request of a supervisor accompanied by a [form].

(Ex. 9 (Directive 9050) at ANNUCCI 029).

The State's written interpretation of the State's laws, as it directs its employees, is that:

> The New York State Board of Parole, or an Officer designated by the Board, is authorized by statute to issue a warrant authorizing the

11

> retaking of a parolee and temporarily detaining the parolee pending
> completion of the revocation process.   A parole violation warrant
> further authorizes and directs local detention facilities to hold those
> parolees in temporary detention without the right to bail. . . .   Parole
> warrants do not expire.   They remain in force until cancelled by
> members of the Board of Parole or completion of the revocation
> process.

(*Id.* at ANNUCCI 035).  The State does provide guidance to parole officers who become aware

that the parole law's due process requirements have not been met:

> When field staff, in reviewing the case, determines that the
> Department has violated one of these [due process] rights, the Parole
> Officer must immediately prepare a Supplementary Violation of
> Release Report indicating the nature of the due process violation and
> recommending cancellation of delinquency.  Supervisory staff must
> expeditiously process that report to the Board for its review and
> decision.  Should the Board cancel delinquency, the warrant is to be
> lifted immediately.

(*Id.* at ANNUCCI 039.)  This guidance is, however, silent as to the Board of Parole's role in

response to that "expeditious[]" request.  Notably, no law, regulation, or directive requires the

Board of Parole to take any action to cancel a warrant that is void for failure to comply with state

law – much less provide a timeframe for doing so.

According to Mr. Uviles's then-attorney, Mr. Hechinger, who spoke to

representatives from NYCDOC and DOCCS, it typically takes "five-to-seven days" for a parole

warrant that the State has elected to cancel to be released.  (UMF ¶13; Ex. 5 (Hechinger Decl.) ¶

9.)  Ms. Hogan, the supervising parole officer, testified similarly, that it takes a week to ten days

to get a decision back from the Board of Parole canceling the delinquency once submitted by a

parole officer.  (UMF ¶ 13; Ex. 3 (Hogan Dep. Tr.) at 38:7-16.).  Mr. Hechinger also spoke on

June 27, 2018 to the Bureau Chief for the Brooklyn Parole Office, who admitted to Mr.

Hechinger that Mr. Uviles should have been released "weeks ago" but was not.  (UMF ¶17; Ex. 5

(Hechinger Decl.) ¶¶ 10-19.)  Mr. Hechinger was informed that the papers that started the

process "got lost" and that the person who fills out the papers to request the cancelation was "on vacation."  (*Id.* at  ¶¶ 13-15.)

Notably, even on June 27, 2018, when Mr. Hechinger was informed that the necessary documentation was provided to the Board of Parole to cancel the warrant, (UMF ¶ 15; *id.* ¶ 18; *see also* Ex. 6 (CHRONOS) at ANNUCCI 015), it still took two days for Mr. Uviles's warrant cancelation to be provided to NYCDOC at Rikers, (UMF ¶ 15; *see* Ex. 13 (Warrant Lift); *see also* Ex. 6 (CHRONOS) at ANNUCCI 014).

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is material when it "might affect the outcome of the suit under the governing law."  *Id*. (quoting *Anderson*, 477 U.S. at 248).  The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).  In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact.  *See Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002).  In determining whether such an issue exists, the court must construe the evidence in the light most favorable to the opposing party and draw all inferences in that party's favor.  *See Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (citations omitted).

## ARGUMENT

**I.     The City of New York's Policy Caused Mr. Uviles's Constitutional Injuries**

To state a municipal liability claim under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), a plaintiff must allege "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) (citations omitted).  In this action, no genuine issue of material fact exists that the City of New York maintains an official policy of deference to the State in determining whether to release parolees who have parole warrants executed and lodged as a detainer, regardless of whether the warrant as issued is a valid legal instrument.  Nor does any genuine issue exist that the policy caused Mr. Uviles to be detained in violation of his constitutional right to be free from unreasonable seizure and his constitutional right to liberty.

As described above, NYCDOC affirmatively maintains a policy of complete deference to the State to inform NYCDOC when it may release an individual who has been held on a parole hold.  When asked whether it does so, the City's representative testified that it does. (*See* Ex. 1 (Monastero Dep. Tr.) at 15:25-17:24, 19:5-11, 28:11-29:5.)  Directive 04/97 from the NYCDOC states that a parolee should be released expeditiously when they return from court with a "release order" in lieu of a "Warrant Lift Authorization."  (*See* Ex. 11 (Directive 04/97).) When asked if there were ways that a parolee might be released from NYCDOC custody while held solely on a parole warrant other than through a "warrant lift" or an order from a judge granting a "release order" to the detainee, the City's representative testified that there was not. (Ex. 1 (Monastero Dep. Tr.) at 28:11-29:5.)  Substantial other evidence confirms this policy.  For example, the City's General Office Manual at NYCDOC provides that a parole warrant always

constitutes sufficient authority to hold an individual, regardless of the process they have received.  (*See generally* Ex. 10 (General Office Manual)).  No written guidance exists regarding the release of a parolee who has not been provided with a hearing in the appropriate amount of time.  (*Id.*)

The City cannot dispute that it maintains a policy of complete deference to the State with regard to the release of parolees.  The only question for the City is whether it was constitutionally permissible to hold Mr. Uviles once he paid his bail.  The City has suggested that Mr. Uviles and others like him must get the State to release them – through a habeas corpus proceeding or otherwise.  The City has also suggested that it acted as an agent of the State in holding Mr. Uviles without legal privilege to do so.  Neither argument has merit.

### A.  No Law Required the City to Hold Mr. Uviles on a Legally Invalid Parole Warrant

The City suggests that the City's continued detention of Mr. Uviles beyond the point at which he paid bail could have been privileged in some sense because the City was acting as an agent of the State of New York and could not exercise its own discretion in releasing Mr. Uviles.  There is no legal support for that proposition and delegation is not permitted.

Parole revocation procedure and cancelation of a parole revocation warrant in New York are governed by Section 259-i of the Executive Law and state and federal constitutional law.  Under New York State law, for a parole warrant to be a valid instrument to hold a parolee, (a) it must be delivered to the detention center, (b) the individual must be provided with notice of the time and place for a preliminary revocation hearing within three days, and (c) the individual must be provided with a preliminary hearing within fifteen days of the execution of the warrant.  N.Y. Exec. Law § 259-i(3)(a)(i).  Under Section 259-i(3)(a)(i), the warrant constitutes "sufficient authority to the superintendent or other person in charge of any

jail, penitentiary, lockup or detention pen to whom it is delivered *to hold in temporary detention* the person named therein." *Id.* (emphasis added.)

Failure to follow the procedural requirements under Section 259-i renders the warrant void, regardless of the State's actions, and ends the authority to detain parolees in "temporary detention." Where Section 259-i is not followed, a parolee *cannot lawfully be imprisoned. See, e.g.*, *McDay*, 303 F. App'x at 930-31. State law is clear on this issue: detention is not privileged by a parole warrant if the State fails to provide a preliminary hearing within fifteen days or a final hearing within 90 days.[3] *People ex rel. Levy v. Dalsheim*, 411 N.Y.S.2d 343, 344 (2d Dep't 1978), *aff'd*, 48 N.Y.2d 1019, 402 (1980); *see also People ex rel. Johnson v. N.Y. State Div. of Parole*, 148 A.D.2d 401, 402 (1st Dep't 1989); *People ex rel Willis v. Travis*, 680 N.Y.S.2d 422, 425 (Sup. Ct. Nassau Cnty 1998) ("Without question, the denial of a prompt preliminary parole revocation hearing entitles the parolee to release and restoration to parole.").[4]

Nothing in the text of Section 259-i, the text of the regulations promulgated thereunder, or the case law requires a local municipality to hold a parolee pursuant to a revocation process that is not consistent with the law. Indeed, quite the opposite. That is precisely the holding of *McDay*, where the Circuit wrote that assuming "for the sake of

---

3.   While Mr. Uviles was not served with parole violation papers and notice of a hearing within three days of the execution of the warrant, failure to timely serve that notice does not entitle restoration to parole as compared to failure to provide a hearing. *People ex rel. Williams v. Walsh*, 241 A.D.2d 979 (4th Dep't 1997). Of course, some amount of notice prior to the hearing *is* required to allow for a procedurally sufficient defense. Nevertheless, because Plaintiff's warrant was clearly invalid by the time that he paid bail, Plaintiff need not address that issue here.

4.   Plaintiff has not found a single case that addresses entitlement to release for failure to deliver the warrant to the detaining institution. Plaintiff presumes that NYCDOC cannot simply rely on the say-so of a parole officer that a warrant exists, and that failure to deliver the warrant to NYCDOC also entitles Mr. Uviles to his release. The question is academic in this case because Mr. Uviles was entitled to his release *regardless* by the time that he paid bail, as the State did not provide him with a hearing within fifteen days of the warrant being executed (to the extent it was). In either instance, NYCDOC's policy was the same: complete deference to the State's *diktat* regarding the validity of the warrant, without any procedures of its own for ascertaining whether a warrant validly privileged the inmate's detention.

16

argument, that the State in fact neglected to ensure that proper procedural safeguards were followed, the City has pointed to no State law or State policy that compelled Plaintiff's detention after the dismissal of criminal charges against him." *McDay*, 303 F. App'x at 930-31. A "parole warrant serves as a basis solely for temporary detention, prior to the adjudication of an alleged parole violation, and is valid only so long as certain procedural safeguards are effectuated." *Id.* at 930 n.2.

It is also the holding of sister circuits that have considered the issue of whether a municipality can offload responsibility onto other entities for ensuring its responsibility to hold only those individuals that it is legally privileged to hold. *See Hayes v. Faulkner County*, 388 F.3d 669, 674 (8th Cir. 2004) ("Because the County's policy here attempts to delegate the responsibility of bringing detainees to court for a first appearance and ignores the jail's authority for long-term confinement, the policy is deliberately indifferent to detainees' due process rights."); *Armstrong v. Squadrito*, 152 F.3d 564, 578-79 (7th Cir. 1998) ("[J]ails cannot confine people without the authority to do so . . . . Furthermore, jailers hold not only the keys to the jail cell, but also the knowledge of who sits in the jail and for how long they have sat there. They are the ones directly depriving detainees of liberty."); *Oviatt v. Pearce*, 954 F.2d 1470 (9th Cir. 1992) ("[A] reasonable jury could conclude that the likelihood of unjustified incarceration was so obvious that defendants' policy with regard to detecting prolonged incarceration without prompt pretrial procedures evidenced deliberate indifference to the rights of inmates . . . .").

The City was not compelled to hold Mr. Uviles by any law of the State of New York once it could be determined that he did not receive the hearing to which he was entitled, and the City could not delegate the responsibility to the State for its actions. In other contexts,

the City is fully aware of its obligation to release prisoners if the procedural pre-requisites for the
maintenance of the detention are not met.

**B.  The Warrant Was Executed When It Was Lodged as a Detainer With
NYCDOC**

While the State of New York, throughout this case, has been the party to raise the

issue of when Mr. Uviles's warrant truly became invalid, rendering him held on a detainer

notation in the IIS and not on a valid legal instrument, the issue is necessary to resolve for claims

against both the City and the State and affects the extent of Mr. Uviles's damages.

The State argued that while the warrant was lodged as a detainer with NYCDOC,

the warrant was not "executed" until it became the sole basis of Mr. Uviles's detention.  That is,

the State has argued that the warrant was not actually "void" under the meaning of Section 259-

i(3)(a)(i) until June 27, 2018, fifteen days after which Mr. Uviles paid bail.  In any event, Mr.

Uviles was detained beyond what was legally or constitutionally permissible by the City and the

State, as he was not released until June 29, 2018.  Regardless, whether the warrant was executed

and invalid under the meaning of the State statute and the attendant case law is vital for

evaluating Mr. Uviles's damages against the City, and the malfeasance of the State.

Under Section 259-i, parole warrants are executed when lodged against in-state

detainees held pretrial.  State law is explicit on this.  *People ex rel. Gonzales v. Dalsheim*, 52

N.Y.2d 9, 13 (1980), *superseded by statute on other grounds* (finding that "the right of the

parolee to prompt revocation hearings was not diminished" because he was being held on

criminal charges in state).  This was also the holding of *McDay*, the only Second Circuit case to

consider the issue, and that holding is consistent with case law from the State of New York.

*McDay,* 303 F. App'x at 930 ("It is also undisputed that . . . the parole warrant was invalid

fifteen days after the warrant's issuance . . . and the City lacked legal authority to hold plaintiff

on the basis of the warrant after that date.").

> Executive Law § 259-i (3)(c)(i) mandates that the Board of Parole
> accord an alleged parole violator a preliminary revocation hearing
> "[w]ithin fifteen days after the [parole violation warrant] and
> temporary detention has been executed." Failure to conduct a timely
> preliminary revocation hearing violates the parolee's right to due
> process unless the Division is able to establish that it could not
> conduct a hearing because the parolee was beyond its "convenience
> and practical control."

*People ex rel. Matthews v. N.Y. State Div. of Parole*, 95 N.Y.2d 640, 643 (2001) (alterations in

original) (citations and emphasis omitted); *see also Windley v. N.Y. State Div. of Parole*, 273

A.D.2d 317, 318 (2d Dep't 2000) (finding that petitioner was entitled to restoration to parole

after 90 days of warrant being lodged as a detainer, regardless of other reasons for detention).

As noted in *Matthews*, "When parolees are serving sentences in state or local

facilities in New York, courts generally enforce the 15-day time period because the parolees are

within the convenience and practical control of the Division." 95 N.Y.2d at 644 n.1 (citing

*People ex rel. Brown v. N.Y. State Div. of Parole*, 70 N.Y.2d 391, 398-399 (1987) ("A parolee is

in a place 'subject to the convenience and practical control' of the Division of Parole when he is

in the custody of a correctional facility as an inmate with which the Parole Board has parole

jurisdiction.")). Mr. Uviles's parole officer evidently agreed with this interpretation of the law.

It was precisely 16 days after the warrant was executed against Mr. Uviles that she sought to

have it canceled for lack of service of the violation of parole papers and for the fact that he had

received no hearing. (*See* Ex. 12 (Cancelation Request).)

As such, Mr. Uviles's warrant was void at the very latest on June 7, 2018, and he

was entitled to release on the day he paid bail. The State has cited to certain cases from New

York Supreme Courts holding that the warrant is not executed until it is the exclusive basis for

19

detention in the state facility, but those cases are lower court cases relying on faulty authority for such proposition.  *See, e.g.*, *People ex rel. Patterson v. Warden, Rikers Island Corr. Facility*, 36 Misc. 3d 1235(A) (Sup. Ct. Bronx Cnty 2012) (citing *Moody v. Daggett*, 429 U.S. 78, 97 (1976)).  Specifically, those cases rely on the Supreme Court's holding in *Moody v. Dagget*, which held that under federal *statutory* law, warrants were not deemed executed until they became the sole basis for detention.  *Moody*, 429 U.S. at 82-83 ("Throughout the progress of this case . . . parole revocation procedures were controlled by the former statutes, 18 U.S.C. §§ 4205 and 4207.").  *Moody* went on to hold that the inmate's substantive due process rights were not violated until after the parole warrant became the sole basis for the detention, because he was then serving a sentence for double murder.  That is not the question here, as this Court held that the issue before it is concerned with whether the City and the State caused Mr. Uviles to be detained without legal privilege to do so.  Further, unlike in *Moody*, Mr. Uviles *did* suffer a liberty deprivation.

Indeed, New York State's highest courts explicitly rejected *Moody*, and the legislature then reined in the courts with respect to out-of-state detainees.  *People ex rel. Gonzales v. Dalsheim*, 52 N.Y.2d 9, 14 (1980) ("We declined to follow the rule announced in *Moody*[.]").  The State then amended Section 259-i after *Gonzales* to add subsection (3)(a)(iii) cited above, but did not otherwise change the statute.  *See Matthews*, 95 N.Y.2d at 644 (explaining that Section 259-i was amended solely with respect to out-of-state parolees due to difficulty of prosecuting the parole violation within fifteen days); *People ex rel. Brown v. N.Y. State Bd. of Parole*, 139 A.D.2d 548, 550 (2d Dep't 1988).[5]

---

5.   Mr. Uviles's detention reflects precisely a situation where requiring the preliminary parole hearing within fifteen days of the execution of the warrant is important.  Mr. Uviles did not pay bail while the parole warrant was pending because he would not have been released. Conversely, the State's argument is that its clock did not start until he paid bail. The circularity argues for a bright line rule requiring a hearing within fifteen days, which the

Because Mr. Uviles's warrant was issued on May 22, 2018, and Mr. Uviles's parole warrant expired on June 7, 2018, he was illegally and unconstitutionally detained for the entire time after he paid bail.

## II.   The State of New York's Policy Caused Mr. Uviles's Injuries and Will Harm Others Like Him in the Future if the State Is Not Enjoined

The State's statutory, regulatory, and policy schemes lack any guidance requiring action by the Board of Parole to cancel an obviously deficient parole warrant, and instead direct that inmates are to be held in local facilities *regardless of whether due process has been met*. Moreover, the State's inefficient administrative procedures – faxing cancelation requests in a process that takes five to seven days on average, and requiring the sign-off of members of the Board of Parole to cancel a parole warrant that is void for lack of process – constitute deliberate indifference to the liberty interests of those on parole.

### A.   The Lack of Policies Requiring the Board of Parole to Act with Reasonable Diligence Upon a Cancelation Request Caused Mr. Uviles and People Like Him to Be Detained

Twenty-two days before his release, Mr. Uviles's parole officer sought to cancel his declaration of delinquency because no one had served him with paperwork and he had not been provided with a parole revocation hearing within fifteen days of the warrant. (Ex. 6 (CHRONOS) at ANNUCCI 017; Ex. 2 (Von Evans Dep. Tr.) at 21:16-22:6.)  After submitting the cancelation paperwork via the main local office, no action was taken on Mr. Uviles's parole warrant cancelation.  Over a week after he should have been released, Mr. Uviles's parole officers were informed that a new package canceling his warrant had to be submitted, even though no higher action ought to have been necessary at all to cancel the warrant for invalidity.

---

State maintained in its 1984 amendments to the statute, even while creating a rule for out-of-state detainees that allowed for more administrative convenience.  *See People ex rel. Brown v. N.Y. State Bd. of Parole*, 139 A.D.2d 548, 550 (2d Dep't 1988)

That this happened as a direct result of the State's failure to maintain any policy whatsoever regarding the cancelation of parole warrants is deliberate indifference to the known and obvious consequences of the failure to maintain a policy. *Board of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403-04 (1997). That the Board of Parole routinely takes five to ten days to address parole warrant cancelations, when parolees might be waiting beyond the time at which they can be legally held, is itself a policy and custom of deliberate indifference.

The failure to have any written policies whatsoever requiring that a member of the Board of Parole – insofar as they are even necessary to this process, which they are not by law - address a cancelation request by a parole officer or senior parole officer, invites constitutional harm. This is particularly so where State employees know and expect that local facilities will completely defer to their parole warrant determinations before releasing parolees. (*See* Ex. 3 (Hogan Dep. Tr.) at 52:14-20.)

The State could have a written policy requiring all cancelation requests for warrants be reviewed and addressed by members of the Board of Parole with six hours of receipt and that any issues be addressed immediately. The State could also have a policy permitting senior parole officers to cancel any revocation warrants themselves – as the State permits prior to enforcement – where the parole officer determines that procedural safeguards have not been met and that the parolee is entitled to release.

The need for such a policy mandating Board of Parole action within a reasonable time has long been obvious. *Bryan Cty.*, 520 U.S. at 403-04; *Francis v. City of N.Y.*, No. 17 Civ. 1453 (LAK)(HBP), 2018 U.S. Dist. LEXIS 143020, at *16 (S.D.N.Y. Aug. 21, 2018) (finding that lack of written policy regarding removal of inmates in protective custody could suffice to cause injury). Other inmates, like the plaintiff in *McDay*, had suffered the same fate as Mr.

Uviles, and state courts are littered with habeas corpus motions and cases seeking compensation

where parolees had not been timely released.  *See, e.g.*, *People of the N.Y. ex rel. Joelle B. Ryu v.*

*Cynthia Brann,* No. 400074-2020, 2020 N.Y. Misc. LEXIS 7567, at *7 (Sup. Ct. Bronx. Cnty

May 15, 2020); *Gonzalez v. State of New York*, 165 A.D.3d 763, 764 (2d Dep't 2018).  The State

knew or should have known that its lack of any policy addressing warrants without sufficient

process would inexorably cause overdetentions.

### B.  The State's Paper-Based and Slow Process for Release Caused Mr. Uviles and Others Like Him to be Overdetained.

The State's policies also cause parolees to be held subject to the errors and whims

of a system that requires, in 2021, faxing documents to a local office and then to the Board of

Parole for approval.  And when received by the Board of Parole, no action is required to be taken

in any specified period.  The State's policies are concerned with keeping parolees accused of

violating their parole in prison unless the State provides a local facility with a warrant

cancelation.  No written policies exist detailing the ways in which a parolee's rights might be

violated if action is not taken promptly to rectify the situation Mr. Uviles faced.

The complete lack of electronic administrative procedures in 2021 to track and

carry out the cancelation of a warrant already void for lack of process is an unacceptable

condition that leads to foreseeable damages.  *See Lynch v. City of New York,* 335 F. Supp. 3d

645, 648 (S.D.N.Y. 2018) (upholding *Monell* claims based upon allegations that antiquated

administrative procedures prolonged detentions); *Barnes v. District of Columbia*, 793 F. Supp.

2d 260, 280 (D.D.C. 2011) ("In the meantime, free men and women were treated as prisoners,

hoping the DOC's paper-bound and Byzantine release process would favor them with an on-time

release.").  That Mr. Uviles's parole cancelation could be delayed by 22 days because of a

paperwork issue, and then left unaddressed for an additional 48 hours even when it was known

that he was sitting in jail on an invalid parole warrant, is sufficient evidence to establish that the system is lacking any procedural safeguards to protect parolees from the whims of a Byzantine system. And as discussed, Mr. Uviles is not alone, with the process taking five to ten days *on average*. Policies must be created to expedite the system.

### C. Mr. Uviles's Case Is Not Moot

The State argued in its pre-motion letter that Mr. Uviles's case against it is moot because he is no longer on parole and the only relief he may seek is retrospective.[6] It is true that typically to receive injunctive relief against a state official, the injury must be "ongoing" and the relief prospective. *Vega v. Semple*, 963 F.3d 259, 281 (2d Cir. 2020). However, the injury need not be ongoing when the plaintiff is a party representative, and the claims can relate back to the filing of the complaint.

"The relation-back doctrine . . . has unique application in the class action context, preserving the claims of some named plaintiffs for class certification purposes that might well be moot if asserted only as individual claims." *Amador v. Andrews*, 655 F.3d 89, 100 (2d Cir. 2011). In certain cases, "the claims of the named plaintiffs might become moot before the district court had ruled on a certification motion." *Id.* "In such instances, whether the certification can be said to 'relate back' to the filing of the complaint may depend upon the circumstances of the particular case and especially the reality of the claim that otherwise the issue would evade review." *Id.* (quoting *Sosna v. Iowa*, 419 U.S. 393, 402 (1975)).

*Amador* posed similar issues as those in this action. There, women who were imprisoned were challenging "constitutionally defective policies and procedures in failing to

---

6. While the parties agreed to defer class certification issues until summary judgment briefing is complete and a decision on the summary judgment motions is rendered, Plaintiff addresses the mootness issue here on the assumption that Plaintiff will be able later to demonstrate the requirements of class certification. Plaintiff concedes that if he is unable to relate his claims back to the filing of the complaint, his claims are moot.

protect female inmates from sexual harassment, abuse, and assault by male staff." *Id.* at 101. The state supervisory defendants argued that "there is nothing inherently transitory about appellants' claims because inmates serve a range of terms of imprisonment. . . . [W]hile some inmates may be released before their claims can be adjudicated, others will remain incarcerated long enough for courts to adjudicate their claims." *Id.* at 100-01.  The Second Circuit rejected that argument, writing:

> While the entire class may be exposed to the risks caused by the constitutionally defective policies and procedures alleged, as noted, the grievance procedure may be triggered only by an inmate who has been a victim of sexual misconduct.  Because the number of inmates subjected to acts of misconduct can be a small fraction of the total inmates at risk, the odds of an inmate being able to complete the grievance procedure and litigate a class action while still incarcerated are rather small.

*Id.* at 101.  The Second Circuit reversed the district court and ordered that the plaintiffs whose claims had been dismissed for mootness be restored as representatives of the class.

The key issue here, as in *Amador*, is whether the mootness resulted from a factor closely related to the essence of the claim.  *Id.*  As in *Amador*, that there are some parolees whose claims might not evade review because they have lengthier parole terms, does not mean that a parolee whose case evaded review could not represent the class.  Parole status is inherently transitory, and review of unlawful parole policies must be permitted here, even if there may be certain parolees whose claims could be adjudicated prior to them leaving parole status.

## CONCLUSION

The evidence clearly establishes that Plaintiff was detained due to unlawful policies – and lack thereof – established by the City and State of New York and that he is entitled to a trial solely on damages.

Dated: New York, New York
          May 15, 2021

WERTHEIMER LLC

By: _____
      Joel A. Wertheimer
      14 Wall Street, Suite 1603
      New York, New York 10005
      (646) 720-1098
      joel@joelwertheimer.com


      David B. Shanies Law Office LLC


By: _____
      David B. Shanies
      Deborah I. Francois
      411 Lafayette Street, Sixth Floor
      New York, New York 10003
      (212) 951-1710 (Tel)
      (212) 951-1350 (Fax)

26