UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                       :

JOEL UVILES, *on behalf of himself and all others*    :
*similarly situated*,
                                         :    **MEMORANDUM DECISION**

                         Plaintiff,    :    **AND ORDER**
                                         :

        - against -                :    19-cv-3911 (BMC)
                                         :

CITY OF NEW YORK and ANTHONY J.       :
ANNUCCI, *Acting Commissioner for the New York*  :
*State Department of Corrections and Community*  :
*Supervision, in his official capacity*,         :
                                         :

                     Defendants.    :
------------------------------------------------------------- X

**COGAN**, District Judge.

       Due to a combination of administrative errors, plaintiff was held in custody on a parole

warrant for 17 days longer than he should have been.  Contending that the policies and practices

of the New York State Department of Corrections and Community Supervision ("State Parole")

and the New York City Department of Corrections ("City Corrections") caused his over-

detention, he has brought this putative class action for false imprisonment under 42 U.S.C. §

1983 and Monell v. Dep't of Soc. Svcs. of the City of New York, 436 U.S. 658 (1978), seeking

injunctive relief against State Parole and injunctive relief and damages against City Corrections.

       Plaintiff, State Parole, and City Corrections have each moved for summary judgment.

State Parole's motion is granted because, among other reasons, plaintiff seeks only prospective

injunctive relief against it and since he is no longer in custody or on parole, that claim is moot.

City Corrections' motion is granted because its policy and practice do not violate the

Constitution.  This means plaintiff's motion necessarily is denied.

## BACKGROUND

On or about December 21, 2017, plaintiff began his parole supervision after serving time on a prior conviction.  On May 22, 2018, he incurred a fresh arrest by New York City police officers on a domestic relations matter involving an alleged assault.

State Parole received notice of the arrest that same day, and a parole officer, Johnny Ortiz, conferred with the NYPD arresting officer.  Parole Officer Ortiz then passed on what he had learned to Senior Parole Officer Scanlon (first name not given by the parties), and SPO Scanlon issued a parole warrant based on the underlying criminal charges.  (That is, the alleged criminal conduct, if true, would have also constituted a parole violation.)  State Parole sent copies of the warrant to the precinct out of which the arresting NYPD officer worked, and to the arraignment part of the Brooklyn Criminal Court, the court in which plaintiff had been charged.

Plaintiff was arraigned in Brooklyn Criminal Court on May 23, 2018 on both felony and misdemeanor charges of assault and robbery.  The court set a $7500 cash bail that plaintiff was unable to post.  He was then sent to Rikers Island and thus came into the custody of City Corrections.

On May 25, 2018, plaintiff appeared in court again.  The court dismissed the felony charges and reduced plaintiff's bail on the remaining misdemeanor charges to $2,500 cash and a $1,500 bond.

Plaintiff's Parole Officer, Legenda von Evans, was on vacation at the time of plaintiff's arrest.  After returning from vacation on June 4, 2018, she began an investigation into the alleged parole violation.   Plaintiff was not served with a Violation of Release Report ("VORR"), which details the charges against him, or a Notice of Violation, which schedules a preliminary parole revocation proceeding and gives the parolee the option to waive that proceeding.

On June 7, 2018, SPO Hogan prepared paperwork recommending that plaintiff not be declared delinquent and that the parole warrant be lifted, writing that although Parole Officer Ortiz had issued a warrant for a parole violation on the date of plaintiff's arrest on the criminal charges, plaintiff "was not served with the violation of release report within the required timeframe.  Therefore, we are submitting a cancelation of delinquency due to non-curable service defect."

The "required timeframe" referred to N.Y. Exec. Law § 259–i(3).  That statute provides that within 15 days from the date of execution of a parole warrant, State Parole must give the parolee a Notice of Violation or a VORR, and, unless waived, hold a preliminary hearing (also called a "probable cause" hearing) on the parole violation.  (The statute also requires a final hearing on the parole violation within 90 days of execution.)  Plaintiff had not been served with either of these documents and had not been given the opportunity to proceed with or waive a preliminary hearing.  If one counts 15 days from the date the parole violation was lodged with City Corrections on May 23rd, plaintiff should have had his preliminary hearing, as calculated by his parole officer, on or before June 7, 2018.

SPO Hogan forwarded the paperwork to the Parole Violator's Unit for submission to the Board of Parole to recommend dropping the parole violation charges and lifting the parole warrant.  State regulations require three Commissioners of the Board of Parole to sign off on such a recommendation before the violation charges are dropped and the warrant is vacated. New York Corrections and Community Supervision, *Directive, Community Supervision Reconvocation Process*, VII(E) (Aug. 6, 2018).

Plaintiff made bail on the criminal charges on or about June 12, 2018.  However, he was not released from Rikers Island because he continued to be held on the parole warrant.  At that

point, plaintiff, his family, and his attorneys called and emailed State Parole and City Corrections more than once trying to get him released.  They were told variously that the necessary person to sign off for State Parole was on vacation or that there was a mix-up with the paperwork.  In response to these efforts, City Corrections officers tried informally to get State Parole to lift the warrant, but they could not release plaintiff, or at least believed they could not release plaintiff, until State Parole had in fact lifted the warrant.

On June 26th, staff from the Board of Parole advised Parole Officer Von Evans and Supervising Parole Officer Hogan that the recommendation package they had submitted was incomplete.  To dismiss the parole violation charge and vacate the warrant, the Board still needed a VORR, whether a timely hearing had been held or not.  SPO Hogan sent the VORR to the Board that same day.  Three days later, on June 29th, the three Board of Parole members signed off, and plaintiff was released.  The Brooklyn Criminal Court dismissed the criminal charges against him some months later.

Plaintiff commenced this action on July 8, 2019.  He seeks declaratory and injunctive relief on behalf of a class under the Fourth and Fourteenth Amendments against State Parole, through its Acting Commissioner of State Corrections, Anthony J. Annuci, "declaring unlawful and enjoining" the State's "policies, customs, and practices authorizing incarceration of parolees without valid parole warrants and adherence to the legal and constitutional requirements for alleged parole violations."[1]  He seeks that same relief against the City, plus damages for the period of his wrongful imprisonment.

---

[1] Plaintiff had previously asserted a due process claim, but this Court dismissed that claim by Order entered June 30, 2020.  Nevertheless, although this decision addresses the remaining Fourth Amendment claim, the discussion is equally applicable to plaintiff's due process claim.

4

Discovery closed at the end of March 2021.  In early April 2021, in accordance with this Court's individual practice rules, each party – plaintiff, State Parole, and City Corrections – sought leave to move for summary judgment.  Plaintiff also requested leave to move for class certification.

The Court held a premotion conference on April 15, 2021.  The parties discussed with the Court the strengths and weaknesses of the proposed motions, and then the Court turned to scheduling motion dates.  In view of the number of issues and arguments that the parties wanted to raise on summary judgment, the Court inquired of plaintiff whether it might be advisable to defer the class certification motion until the determination of the summary judgment motions. The following discussion on that issue occurred:

> THE COURT: Okay, now let's talk about schedule.  I don't suppose, Mr. Wertheimer, I could talk you into – and I won't make you do it if you don't want – holding back on your class certification motion until we get the defendants' motions and your liability [summary judgment] motion determined.  Do you want it all in one ball of wax?
>
> MR. WERTHEIMER [plaintiff's counsel]: I have no problem with that, your Honor.  We can hold it back.
>
> THE COURT: All right, let's do that then.  Let me set a schedule on dispositive motions, which I understand the defendants want to make prior to class certification, right?
>
> MS. COLLINS [Counsel for Annuci]: Correct, your Honor.
>
> THE COURT: So let's do that. . . .

The summary judgment motions were fully submitted on June 5, 2021.  Those are the subject of this decision.

By the time the motions were submitted, plaintiff was no longer on parole, as his term ended on January 11, 2021 without further incident.

**DISCUSSION**

**I.**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Id.

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). "Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment." Zdzieblowski v. Town of E. Greenbush, 336 F. Supp. 2d 194, 201 (N.D.N.Y. 2004) (citing Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)). In determining whether genuine issues of material fact exist, a court is required to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. Cty. of Oneida, 375 F.3d 206, 219 (2d Cir. 2004). In deciding a summary judgment motion, "the court cannot properly make credibility determinations or weigh the evidence." Soto v. Gaudett, 862 F.3d 148, 157 (2d Cir. 2017).

## II.

State Parole contends that plaintiff's claim for injunctive relief is moot.  It points out that plaintiff has no stake in the injunctive relief he seeks because he is no longer in custody or on parole.  See Robinson v. New York, 550 F. App'x 63, 64 (2d Cir. 2014) (plaintiff's claims moot after term of supervised release terminated).

The mootness doctrine holds that "[i]n general, a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Comer v. Cisneros, 37 F.3d 775, 798 (2d Cir. 1994) (cleaned up); see also County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979); Powell v. McCormack, 395 U.S. 486, 496 (1969).  The mootness doctrine "ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit, including the pendency of the appeal." Cook v. Colgate University, 992 F.2d 17, 19 (2d Cir. 1993) (citation omitted).  When, as here, a plaintiff seeks prospective injunctive relief against a state official, the claim is moot if the plaintiff's injury is not "continuing."  See Sudler v. City of New York, 689 F.3d 159, 177-78 (2d Cir. 2012).

Plaintiff has no cognizable interest in the injunctive relief that he is seeking.  To find that plaintiff's claim for injunctive relief is not moot, this Court would have to assume that he is going to be arrested for some new crime, convicted, sentenced to parole after a custodial term, have the warrant lifted, and again be detained longer than he should be.  That is far too speculative to save his injunction claim from mootness, see id., and, in fact, plaintiff does not argue otherwise.

However, as the Second Circuit has recognized, "[t]he mootness doctrine is riddled with exceptions." Comer, 37 F.3d at 798.  Although mootness is generally applicable in putative class actions, see Bd. of Sch. Commis. of Indianapolis v. Jacobs, 420 U.S. 128, 129 (1975), a number

of exceptions to mootness exist in that context.  One of these exceptions is where the named

plaintiff's interest is inherently transitory, so that the question raised is capable of repetition yet

likely to evade review.  See Salazar v. King, 822 F.3d 61, 73 (2d Cir. 2016).  A related exception

as to which there is little controversy is where the district court has already granted class

certification before the named plaintiff's claim would otherwise have become moot.  See County

of Riverside v. McLaughlin, 500 U.S. 44, 51-52 (1991); Comer, 37 F.3d at 798 ("[C]lass

certification will preserve an otherwise moot claim.").  Yet another is where the class

representative's claim becomes moot during an appeal.  See United States Parole Comm'n v.

Geraghty, 445 U.S. 388, 404 (1980).  Finally, the class action exception to mootness can also

apply when a motion for class certification is pending, even though not decided, at the time of

the event that would otherwise cause mootness.  See Sosna v. Iowa, 419 U.S. 393, 399 (1975);

Amador v. Andrews, 655 F.3d 89, 99-101 (2d Cir. 2011) ("It would seem to us that the principle

espoused in Geraghty is applicable whether the particular claim of the proposed class plaintiff is

resolved while a class certification motion is pending in the district court (as in the present case)

or while an appeal from denial of a class certification motion is pending in the court of appeals

(as in Geraghty).  In neither event is the plaintiff automatically disqualified from being a class

representative." (quoting Wilkerson v. Bowen, 828 F.2d 117, 121 (3d Cir. 1987))).

A less established expansion of the class action exception to mootness may occur when

the named plaintiff has not yet moved for class certification because he lacked a reasonable

amount of time to do so.  The best example of this may be Weiss v. Regal Collections, 385 F.3d

337 (3d Cir. 2004), *abrogated on other grounds*, Campbell-Ewald Co. v. Gomez, 577 U.S. 153

(2016).  There, the defendant had made a settlement offer under Federal Rule of Civil Procedure

68(a) barely two months into the case – before the plaintiff had the opportunity to move for class

certification or even obtain discovery – in the maximum amount that the plaintiff could have recovered.  The plaintiff did not accept the offer, but the Third Circuit agreed with the district court that the Rule 68(a) offer rendered the case moot.[2]

Nevertheless, because the plaintiff in Weiss had not had a reasonable time to seek class certification, the Third Circuit remanded so that the district court could allow the plaintiff sufficient time to file a class certification motion and avoid mootness by bringing himself within the "pending class certification motion" line of cases.  Id. at 348-49.  The Court emphasized that its holding should be narrowly applied and limited to those cases when mootness occurs as a result of a very quick Rule 68(a) offer on the named plaintiff's claim.  Id.; see also White v. OSI Collection Services, Inc., No. 01-cv-1343, 2001 WL 1590518, at *5-6 (E.D.N.Y. Nov. 5, 2001) (limiting exception to mootness to where defendants make a quick Rule 68(a) offer).  As to other situations, the Third Circuit expressly deferred to its prior decision in Lusardi v. Xerox Corp., 975 F.2d 964, 973-84 (3d Cir. 1992).  See Weiss, 385 F.3d at 348-349.  There, it held that because the named plaintiffs had settled their individual claims before moving for class certification, those claims were moot.  Lusardi, 975 F.2d at 973-84.

The Second Circuit has not considered whether the class action exception to mootness should be further expanded to include cases where no class certification motion has been made when the named plaintiff's claim became moot, but the named plaintiff did not have a reasonable time to seek class certification.  Cf. Azim v. Vance, 530 F. App'x 44, 46 (2d Cir. 2013) (dismissing case where plaintiff had not moved for class certification prior to his claim becoming moot).  Depending on the facts, some district court decisions within the Circuit have held that it

---

[2] Twelve years later, in Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 165 (2016), the Supreme Court rejected the Third Circuit's holding in Weiss that an unaccepted Rule 68 offer for the maximum possible recovery would render the plaintiff's claim moot.

should be so expanded, either expressly adopting or at least paralleling the Third Circuit's

reasoning in Weiss.  See Eckert v. Equitable Life Assurance Society of U.S., 227 F.R.D. 60, 63

(E.D.N.Y. 2005); Nasca v. GC Services Ltd. P'ship, No. 01-cv-10127, 2002 WL 31040647, at *2

(S.D.N.Y. Sept. 12, 2002); Schaake v. Risk Management Alternatives, Inc., 203 F.R.D. 108, 112

(S.D.N.Y. 2001); Crisci v. Shalala, 169 F.R.D. 563, 567 (S.D.N.Y. 1996).  Other decisions have

not.  See e.g. Greif v. Wilson, Elser, Moskowitz, Edelman & Dicker LLP, 258 F. Supp. 2d 157,

161 (E.D.N.Y. 2003) (declining to apply mootness exception when plaintiff did not indicate that

she was prevented from commencing discovery or moving for class certification after 20

months); Ambalu v. Rosenblatt, 194 F.R.D. 451, 453 (E.D.N.Y. 2000) (mootness not avoided

when plaintiff, although styling the action as a class action, had made no certification motion a

year and a half after commencement of the action and one year after the Rule 68 offer).

     This Court is hesitant to further expand the class action exception to mootness to include

cases where the plaintiff has not even moved for class certification.  There comes a point at

which exceptions swallow a rule.  See Lusardi, 975 F.2d at 983 (declining to create a mootness

exception where no class certification motion is pending, because "[w]ithout a rule that plaintiff

have a live claim at least when the motion to certify is filed, the 'case or controversy'

requirement would be almost completely eviscerated in the class action context").  Mootness

goes to the court's subject matter jurisdiction, see DeFunis v. Odegaard, 416 U.S. 312, 319-20

(1974), the most important threshold issue that federal courts face.  Subject matter jurisdiction

cannot be infinitely expandable by judicial pronouncement.[3]

---

[3]Even the narrowly defined class action exception to mootness based on a pending class certification motion might
not be reaffirmed on a clean slate today.  The relaxation of the "case or controversy" requirement for class actions
occurred in "the heady days in which [the Supreme] Court assumed common-law powers to create causes of action."
See Correctional Services Corp. v. Malesko, 534 U.S. 61, 75 (2001) (Scalia, J., concurring).  Congress has shown
that within constitutional parameters, it will alter jurisdictional requirements, see Arthur R. Miller, 14AA Fed. Prac.
& Proc. Juris. § 3701 (4th ed.) ("[I]t seems reasonable to surmise that Congress again was attempting to reduce the
caseload in the federal courts, take account of inflation, and reach a compromise between competing legislative

Congress could amend Rule 23 to prohibit the named plaintiff in a putative class action from settling without court approval, or perhaps provide that if the named plaintiff has an interest in the putative class action at the outset of the case, he does not lose that interest based on events that occur subsequent to the commencement of the case.  But it has not done so.  Courts, particularly district courts, should therefore exercise caution before extending subject matter jurisdiction to a place that may well be beyond the accepted meaning of "case or controversy" under Article III of the Constitution.

Even if there are some cases in which the Weiss exception should be available, this is not one of those cases.  This case has been pending going on four years, and no firm schedule for moving for class certification has been set.  This case does not involve a quick but unaccepted Rule 68(a) offer.[4]  The parties have proceeded through discovery, and discovery is closed.  Thus, it is difficult to conclude that plaintiff has not had a "reasonable chance" to seek class certification.

Plaintiff says he has not sought class certification because of the way the case was scheduled.  He contends that he would not have allowed the possibility of the case becoming moot as to State Parole just by agreeing to make the class certification motion after the summary judgment motion.  As he argues: "What Defendant Annucci forgets [by asserting mootness], however, is that the Plaintiff explicitly agreed with the Court during the pre-motion conference on April 15, 2021 to defer class certification briefing."  As the colloquy above shows, he is mostly correct.  But that history hurts him rather than helps him.

---

proposals" in raising the threshold for diversity jurisdiction to $75,000), and, indeed, it has done so specifically in the class action context, see Purdue Pharma L.P. v. Kentucky, 704 F.3d 208, 213 (2d Cir. 2013) (discussing Congressional expansion of jurisdiction through Class Action Fairness Act).

[4] Nor would that moot the case.  See fn. 2, supra.

The Court did not twist his arm in suggesting the resolution of the motions in tranches, with class certification last.  Rather, the Court made it clear that it would allow plaintiff to proceed in tandem if that is what he wanted.  He didn't.  Plaintiff made a deliberate decision to postpone class certification.  The Court raised the issue, but it also made clear that it was plaintiff's choice.

Of course, the Court had no knowledge of when plaintiff's parole period was going to end – and didn't until the filing of these motions.  Plaintiff presumably did, or should have.  There can be no doubt that if plaintiff's counsel had advised the Court at the premotion conference (or even after) that delaying the class certification might create a mootness issue, the motions would have been heard together, or an Order entered that the class certification was deemed to have been made subject to a deferred briefing schedule, or some other solution to the problem would have been explored.  Thus, to the extent plaintiff is seeking to place the responsibility for the mootness on the Court, the facts do not support that.  This was plaintiff's decision.

Plaintiff also appears to try to blame defendants for agreeing to this schedule: "Indeed, it was defendants who received a stay pending the motion for class certification."  By "stay," I assume plaintiff means the scheduling of the class certification motion after decision on the summary judgment motions (since discovery was complete, there was not much else to stay).  But whatever plaintiff thinks defendants "received," plaintiff received it too.  And defendants, if they were even aware that plaintiff's parole period would shortly expire, had no obligation to advise plaintiff of the potential mootness issue in advance.  Plaintiff thus cannot avoid responsibility for this decision by pinning it on defendants.

Moreover, there were other steps plaintiff could have taken to save the claims for injunctive relief against State Parole from mootness.  Once he received State Parole's brief arguing mootness, he could have renewed his request for leave to move for class certification, which the Court would have surely allowed under these circumstances.  That would parallel the relief ordered in <u>Weiss</u>.  Alternatively, he could have brought in as intervenors one or more additional plaintiffs who are still on parole, as has occurred in many cases where similar issues arise.  <u>See</u> <u>Swan v. Stoneman</u>, 635 F.2d 97, 102 n.6 (2d Cir. 1980).

We should return briefly to the Third Circuit's decision in <u>Lusardi</u>, as that also involved plaintiffs who elected themselves into mootness.  In <u>Lusardi</u>, the named plaintiffs had settled and actually stipulated to the dismissal of their claims.  They mistakenly believed the stipulations meant that although they could no longer participate in a class recovery, they had still retained their right to serve as class representatives.  When they realized the effect of the stipulation, they argued that the stipulation should be replaced "with an order dismissing the individual damage claims of the named plaintiffs and declaring that they have maintained a personal stake in the controversy sufficient to satisfy Article III Constitutional 'case or controversy' requirements," <u>Lusardi</u>, 975 F.2d at 969 (internal quotations omitted), which was what they originally intended. As noted above, the Third Circuit held that the district court had properly rejected this request because there was no class certification motion pending when the plaintiffs' claims became moot. That is the situation here.

Finally, plaintiff in this case argues that he falls within another class exception – that his status as parolee is "transitory" and thus his claims are not moot even after expiration of his parole.  Even if plaintiff's claims could be considered transitory, <u>but</u> <u>see</u> <u>Jobie O. v. Spitzer</u>, No. 03-cv-8331, 2007 WL 4302921, at *13 (S.D.N.Y. Dec. 5, 2007) (parolee's claims not transitory),

avoiding mootness based on a transitory claim also requires, at least, a pending class certification motion at the time the transition occurs, see Muhammad v. City of New York Dept. of Corrections, 126 F.3d 119, 123 (2d Cir. 1997) (although plaintiffs' claims were transitory, they were not saved from mootness because "no class was ever certified in this case, nor was certification ultimately sought by [named plaintiff] or any of the other plaintiffs.").  As the Court held in Lusardi, those cases holding that mootness can be avoided if the named plaintiff's claim is transitory "still require the named plaintiff to have a personal stake when the class certification motion at issue was *filed*."  Lusardi, 975 F.2d at 982 (emphasis in original).

Because Article III requires a case or controversy, this is not a matter of the Court's discretion.  The claims against defendant Annuci, seeking only prospective injunctive relief, are dismissed as moot.  In addition, plaintiff's claim for the same injunctive relief against City Corrections is no less moot, and that claim is dismissed as well.

### III

Plaintiff seeks damages for wrongful imprisonment for the 17 days between when he paid bail on June 12, 2018 to when he was released from custody on June 29, 2018.  Plaintiff has not demanded damages from State Parole, recognizing that the Eleventh Amendment prohibits an award of damages against the State and its officers.  See Will v. Mich. Dept. of State Police, 491 U.S. 58, 70-71 (1989).  He is, however, seeking damages against City Corrections under Monell for an unlawful policy or practice.

City Corrections argues that it is entitled to share in State Parole's sovereign immunity because in holding plaintiff in custody, it was performing a mandatory duty imposed by New York law, and thus it acted only as a non-discretionary agent of the State.  City Corrections

14

contends that under plaintiff's theory of liability, it would have had to ignore state law in releasing plaintiff before State Parole had lifted the warrant.

Rather than seeing City Corrections' argument as a defense, plaintiff contends that it is, in fact, an admission that City Corrections' complete deferral to State Parole is an unconstitutional policy and practice. Whether or not New York law mandates that deferral – and plaintiff contends that it does not – he argues that if indeed City Corrections has assumed an obligation, in fact or in law, to wait for State Parole to vacate the warrant even though New York law holds that the warrant is invalid, and City Corrections knows or should know that the warrant is invalid, then either state law or City Corrections' policy and practice is unconstitutional. Either way, according to plaintiff, City Corrections must answer in damages for having adhered to it.

To evaluate these arguments, it is important to precisely define the issue. The issue is not whether state law requires City Corrections to seize and hold a parolee subject to a parole warrant. It does. Rather, the issue is *when is City Corrections obligated to release the parolee.* As to that issue, both State Parole and City Corrections have taken the view that the release obligation does not arise until State Parole has formally vacated the warrant. But that is a matter of their policy choice, not state law.

In arguing that state law eliminates its discretion, City Corrections relies on N.Y. Exec. Law § 259-i(3)(a) and New York case law applying it as standing for the proposition that City Corrections must execute the warrant, *i.e.*, take the parolee into custody and hold him. See Ayers v. Coughlin, 72 N.Y.2d 346, 355, 533 N.Y.S.2d 849, 853 (1988) (local custodians "have no role in the scheduling or conduct of the [parole violation] hearings");[5] Davis v. State, 257

---

[5] Ayers could not be more factually inapposite to this case – local law enforcement custodians were suing State Corrections as to how long after conviction State Corrections could delay taking custody of the defendant.

A.D.2d 112, 116, 691 N.Y.S.2d 668 (3rd Dep't 1999) ("[W]hether an issued warrant is to be executed is indeed compulsory").

These authorities confirm that execution of the warrant is non-discretionary.  But they do not address when or what kind of notice City Corrections must have that the warrant is no longer operative and therefore cannot support a continued hold on the parolee.[6]  In other words, the statute and case law under it speak to arrest, not release.  And although Exec. Law § 259-i(3)(a)(ii) provides that "[t]he retaking and detention of any such person may be further regulated by rules and regulations of [State Parole] not inconsistent with this article," neither State Parole nor City Corrections has pointed this Court to any such rules or regulations addressing release.

The fault in City Corrections' failure to distinguish between the execution and hold obligation, on the one hand, and the release obligation, on the other hand, is evident from its brief.  City Corrections quotes Exec. Law § 259i(3)(a)(ii) as stating: "'Any such officer to whom such warrant shall be delivered is authorized and *required to execute such warrant by taking such person and having him detained*' until state parole officials notify them that parole violation proceedings have concluded."  (emphasis in original).  The sub-quote accurately recites the statute, but the addition of "until state parole officials notify them that parole violation proceedings have concluded", does not.  That is merely City Corrections' gloss on the statute.

The other evidence upon which City Corrections relies to establish that it had a non-discretionary duty to hold plaintiff until the warrant was lifted is not persuasive.  First, it relies on plaintiff's deposition testimony as to his understanding that the problem with holding him too

---

[6] In a summary order, McDay v. Travis, 303 F. App'x 928, 929 (2d Cir. 2008), the Second Circuit commented that if City Corrections had a *de facto* policy or practice of waiting for the lifting of a parole warrant to release the parolee, even if it knew that State Parole had not met the time periods in the Executive Law, "at least in this case, the [policies and practices] were in apparent tension with state law, which explicitly denied the City authority to hold plaintiff on that basis after the warrant expired."  McDay is discussed below.

16

long "was something to do with Albany."  From this, City Corrections extrapolates that plaintiff has admitted that it was State Parole, not City Corrections, that caused the problem.  This opinion testimony by a non-lawyer may not even be admissible, but if it is, it has little probative value.  Plaintiff's lay understanding of the parties' legal obligations is not evidence of what the law actually is.  It is just his opinion.  It was obviously formed as a result of information he obtained either from his lawyer or someone at Rikers Island or City Corrections explaining why they could not release him.

The same is true of the other evidence upon which City Corrections relies, the deposition testimony of SPO Hogan.  She testified much more clearly than plaintiff that in her opinion, City Corrections had no discretion to release plaintiff until the parole warrant was lifted.  It seems clear enough that a Senior Parole Officer can testify to the understanding, policies, and practices of State Parole, but all she did or could do was articulate State Parole's policy, not the requirements of New York law.  It may be that this policy is informed by State Parole's interpretation of the legal authorities upon which City Corrections relies here.  However, this Court has already concluded that those authorities are inapplicable to the issue of whether there are circumstances short of vacating a parole warrant that would allow or require the release of a parolee.

The fact that release, rather than execution and hold, constitutes a distinct issue is also obvious from the practicalities of the situation.  If State Parole is delayed in vacating the warrant solely due to bureaucratic inefficiency and human error, as happened here, and City Corrections knows that, it would hardly cause a New York constitutional crisis for City Corrections to release the parolee.  In that situation, State Parole ought to appreciate City Corrections expediting the process to avoid wrongful imprisonment.

City Corrections has not pointed to any written policies within its own procedures or State Parole's written procedures that mandate this. In the absence of such written policies or pronouncements and the lack of evidence suggesting legal compulsion on City Corrections, what we are left with is a *de facto* policy and practice shared by both State Parole and City Corrections – that City Corrections shall retain custody of any parolee held on a parole violation warrant until State Parole lifts the warrant, regardless of whether line-level City Corrections officers have reason to know that the warrant is invalid. A *de facto* policy can be just as unconstitutional as a *de jure* policy. See Connick v. Thompson, 563 U.S. 51, 61 (2011) (governmental entities can be held liable for "practices so persistent and widespread as to practically have the force of law"); Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986) (a policy for purposes of § 1983 is "a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible [under state law] for establishing final policy with respect to the subject matter in question.").

The only difference is that the voluntary nature of compliance with this policy and practice fatally undermines City Corrections' contention that it is entitled to sovereign immunity as the agent of the State. It has made its own choice as to whether to apply that policy to a situation when it knows or should know that the warrant is invalid, even though State Parole has not completed the ministerial act of lifting it.

## IV

In determining whether the policy and practice of City Corrections and State Parole violates the Fourth Amendment, we again have to carefully define the issue. Plaintiff's argument is entirely predicated on the state law requirement to hold a preliminary hearing on the parole warrant within 15 days of the warrant's execution. See Exec. Law § 159-i(3)(c)(i). It is settled

constitutional law that a parolee is entitled to a preliminary hearing "as promptly as convenient."

See Morrissey v. Brewer, 408 U.S. 471, 482 (1972).  However, it is not at all settled that the 15-

day time period is the outer constitutional boundary of "as promptly as convenient."

As to State Parole, plaintiff contends that as soon as 15 days pass after the warrant is

lodged with no preliminary hearing or waiver, the parolee must be released because the warrant

is void.  Damages begin to accrue against City Corrections (and would accrue against State

Parole but for sovereign immunity), under plaintiff's theory, at 12:01 a.m. on day 16.

The primary legal authority for plaintiff's argument is the Second Circuit's summary

order in McDay v. Travis, 303 F. App'x 928 (2d Cir. 2008) ("McDay II"); see also McDay v.

Travis, No. 05-4269, 2007 WL 4102718 (2d Cir. 2007) ("McDay I").  There, the plaintiff had

been held in custody for eight months on a parole warrant without any preliminary or final

hearing.  In fact, that eight months was two days longer than the maximum custodial sentence

originally imposed on the plaintiff.  That is, if McDay's parole had been revoked and he had

been recommitted to custody, he would still have to have been released two days earlier than he

was.

In McDay I, the Second Circuit affirmed the district court's grant of summary judgment

to State Parole and individual officers of State Parole and City Corrections (on grounds not

relevant here), but it held in abeyance the district court's order granting summary judgment in

favor of City Corrections pending further briefing.  The Court explained:

> [B]ecause of the State's failure to afford McDay the hearings to which he
> was entitled by law, the warrant the City used as a basis for holding McDay beyond
> his maximum release date may have been illegal under State law – and therefore,
> may not have constituted sufficient authority to detain McDay.  Furthermore,
> even if the warrant was still valid after July 21, 2002 [(the end of McDay's
> maximum term on his custodial sentence)], it may have been unconstitutional for
> the City to use the detaining authority conferred by § 259-i(3)(a)(i) to hold

> McDay after the date the City knew to be the expiration of McDay's maximum
> term of imprisonment.

2007 WL 4102718, at *1 (footnote omitted).[7]

McDay II used stronger language in reversing the district court's grant of summary judgment to City Corrections.  The Court noted that "the City has pointed to no state law or policy that compelled plaintiff's detention after the dismissal of criminal charges against him.  Rather, the record raises the possibility that plaintiff was unconstitutionally detained pursuant to 'the execution of a City policy or custom.'"  McDay II, 303 F. App'x at 930 (quoting Monell, 436 U.S. at 658) (footnote omitted).  The Second Circuit remanded the case to the district court for further proceedings.

Although McDay is a non-precedential decision, it is obviously informative (at least) as to the instant case.  City Corrections' attempts to distinguish it come up short.  Those attempts are predicated on its "mandatory duty" argument.  This Court has rejected that argument above – that is, City Corrections had both discretion and ability to release plaintiff after 15 days when it knew, or could easily have known, that plaintiff had not had his hearing.  In the same vein, City Corrections relies on the Second Circuit's statement in McDay II that "[t]o be sure, the record does not clearly demonstrate whether the aforementioned regulations may be attributed to the City or the State."[8]  See McDay II, 303 F. App'x at 931.  City Corrections argues that, in this case, the record is different, as State Parole, through the undisputed testimony of SPO Hogan,

---

[7] The Court was not entirely clear in McDay I as to the disposition of the claims against City Corrections.  It held that "[t]he district court erred … in granting summary judgment for the City of New York," but it also directed further briefing as to the disposition of the claims against the City, and did not reverse the district court as to City Corrections until McDay II.  See McDay I, 2007 WL 4102718, at *1.

[8] It is not clear what the Second Circuit meant by "aforementioned regulations", as there were no regulations identified or mentioned in McDay II.  The Court may have been referring to the complete deferral policy that the City was urging and the Court was discussing.

also believes that City Corrections has no discretion to release a defendant until the parole

warrant is vacated by the Parole Board.  But this Court has already concluded that any such

policy adopted by State Parole is voluntary, as is City Corrections' decision to observe that

policy.[9]

Similarly, State Parole's effort to distinguish McDay II also is inadequate – it points out

that State Parole was not a party to the case.  That is accurate, but it would not have made any

difference had it been a party.  The Second Circuit assumed that to which SPO Hogan testified

and both defendants here concede – that they have a policy and practice of not releasing parolees

until the parole warrant is lifted.

However, in one important respect (for this case), McDay II may have stated New York

law too broadly.  Plaintiff understandably relies on the Court's statement that

> [i]f these requirements [including the 15-day hearing] are not timely met, the
> parole warrant is rendered void, and the prisoner is entitled to be released. . . .
> [A]ny parole warrant in the City's possession ceased to be "facially valid" . . .
> after plaintiff was not afforded a probable cause hearing within fifteen days of its
> issuance. . . .  [W]e are aware of no legal authority – and the City has cited none –
> suggesting that a municipality may not be liable for detaining a parolee on the
> basis of a parole warrant that is "facially valid," but is in fact void as a matter of
> law.

McDay II, 303 F. App'x at 923-32.  This notion that the warrant was "void" after 15 days was

the Circuit's own conclusion as to the consequences of passage of the 15-day period without a

preliminary hearing (or the 90-day period without a final hearing).  No New York authority

---

[9]State Parole also argues that under New York law, "execution" of a parole warrant does not occur unless and until
the warrant becomes the sole basis for the parolee's detention.  That is only true in the context of a parolee charged
and held for crimes committed out of state.  See N.Y. Exec. Law § 259-i(3)(a)(iii) (formerly subsection (iv)).  The
New York Legislature enacted that provision in 1984 to overrule the New York Court of Appeals decision in
Gonzales v. Dalsheim, 52 N.Y.2d 9, 436 N.Y.S.2d 199 (1980).  See Matthews v. N.Y.S. Div. of Parole, 95 N.Y.S.2d
640, 722 N.Y.S.2d 213 (2001); Goad v. Coveny, 179 A.D.3d 1266, 118 N.Y.S.3d 249 (3d Dep't 2020).  In addition,
State Parole's argument is contrary to the understanding of its own parole officers and the Board of Parole, as
reflected by the facts of this case.

declares that a parole warrant is "void" or "void as a matter of law" if the preliminary hearing does not occur within 15 days. The statute spells out no consequences for breach of the 15-day rule; it simply states that a preliminary hearing shall be held in 15 days. See Exec. L. § 259-i(c)(i) ("Within fifteen days after the warrant . . . has been executed . . . the board of parole shall afford the alleged presumptive . . . parole . . . violator . . . a preliminary revocation hearing.").

The case cited by the Circuit in support of its conclusion of voidness, Levy v. Dalsheim, 66 A.D.2d 827, 411 N.Y.S.2d 343, 344 (2d Dep't 1978), aff'd, 48 N.Y.2d 1019, 425 N.Y.S.2d 802 (1980),[10] dealt with the 90-day limit, not the 15-day limit, concluding that "[t]o merely order a hearing within a specified time would render the 90-day limit a nullity." That is easy enough to understand since the statute places an outside time limit on the finding of guilt or innocence, but it is less necessary with regard to an interim date like the preliminary hearing on the limited issue of probable cause, which could be held later (at least somewhat later) than 15 days without compromising the 90-day outside limit and often, if not usually, without any prejudice to the defendant. And in any event, the Dalsheim court did not refer to even the failure to observe the 90-day limit as rendering the warrant as "void as a matter of law"; it simply allowed that a habeas corpus special proceeding would lie to obtain vacatur of the warrant and the parolee's release if there was no reason for breaching the 90-day requirement.

In addition, although the Circuit correctly observed that there was "no legal authority" for City Corrections to continue to observe a warrant where the required hearing was not timely held, it is now 14 years since McDay II, and there is some authority strongly suggesting that the

---

[10] The Second Circuit also cited Willis v. Travis, 178 Misc. 2d 469, 680 N.Y.S.2d 422 (Sup. Ct. Nassau Co. 1998). That case held that a petitioner who received notice of his preliminary hearing one day late could bring a habeas action, but the court did not hold that the parole warrant was rendered "void as a matter of law" because of this delay. See id. at 425.

term "void" that the Circuit arrived at is too severe – a better term might be "voidable," and, at least under New York law, a delay within the 90 days for a final hearing is not separately actionable as a claim for false imprisonment.

Gonzalez v. State of New York, 165 A.D.3d 763, 85 N.Y.S.3d 523 (2nd Dep't 2018), was an action for common law false imprisonment. The plaintiff-parolee's preliminary hearing had been set for the eleventh day post-execution, but the State Parole hearing officer adjourned it, resetting it for what she thought was the fifteenth day. She calculated wrong. The hearing occurred on the nineteenth day following Gonzalez's arrest on the parole warrant. At the belated hearing, Gonzalez's counsel objected that the hearing was untimely; that the charged violation should be dismissed; and that the warrant should be vacated. The State Parole hearing officer, however, stated that she was "without authority" to declare the warrant invalid and that Gonzalez's counsel "could make her record for a writ of habeas corpus", id. 165 A.D.3d at 764, 85 N.Y.S.3d at 524. The hearing officer found sufficient probable cause to support the warrant. Gonzalez's final revocation hearing occurred a week later, and he pled guilty to the charged violation. He was sentenced to twelve months' custody. By the time he was sentenced, he had been held for 27 days since his arrest.

Two months later, Gonzalez sought habeas corpus relief in state court pursuant to N.Y. C.P.L.R. Article 70 on the ground that his detention was improper because he had not been timely afforded his 15-day hearing. State Parole agreed with him, and the court issued the writ, restoring him to probationary status. By the time he was released, he had been held for 140 days.

Gonzalez then sued State Parole in the New York Court of Claims, seeking damages for false imprisonment. The Appellate Division affirmed summary judgment in favor of State Parole on the axiomatic proposition that an action for false imprisonment will not lie where the

imprisonment is privileged.  The Appellate Division reasoned that execution of a valid warrant itself made the imprisonment privileged: "[T]he confinement was privileged.  The State demonstrated that the claimant was arrested pursuant to a facially valid parole warrant and that the short delay in holding the preliminary hearing was not due to misconduct or malfeasance."  Id. at 165 A.D.3d at 765, 85 N.Y.S.3d at 525.

In the instant case, plaintiff attempts to distinguish Gonzalez on its facts, but although there are distinctions, the most important distinctions weigh against him.  Principally, on plaintiff's theory, Gonzalez's warrant became "void" on Day 16, when he had not received his preliminary hearing, and he was therefore held for nearly five months with no legal process.  But since the Appellate Division rejected his claim for false imprisonment, we cannot consider his warrant as "void" under New York law on Day 16, or, indeed, void at any other time.  Here, plaintiff's maximum overdetention was a comparatively small 17 days.  Thus, at the very least, Gonzalez stands for the proposition that a short delay beyond the 15 days in holding the preliminary hearing does not void the warrant, even if that delay results in a months-long period of detention.  More broadly, Gonzalez signifies that New York courts will consider whether there was "misconduct or malfeasance" in determining whether an action for false imprisonment lies, and will evaluate each case on its facts.  Gonzalez strongly suggests that if the overdetention is due to administrative error, then the proper remedy under New York law, assuming that the warrant was valid when executed, is a writ of habeas corpus, not a damages action as a result of the mistake.

In McDay II, City Corrections made the same argument that it makes here, that a "facially valid" warrant makes the detention privileged, even if the preliminary hearing is not held within 15 days.  The Second Circuit rejected that argument for two reasons, first, that the

warrant was not in the record before it, and second, that "any parole warrant in the City's possession ceased to be 'facially valid' . . . after plaintiff was not afforded a probable cause hearing within fifteen days of its issuance." McDay II, 303 F. App'x at 931.  The Court suggested that City Corrections was confusing the "good faith exception" to the Fourth Amendment exclusionary rule based on a facially valid warrant with the due process-compelled New York 15-day rule.  Id. at 931, n.3.

Gonzalez undermines not only McDay II's characterization of a parole warrant in these circumstances as "void," but also the rejection in McDay II of the argument that a facially valid warrant makes the detention privileged even if the 15-day hearing is not timely held.  And Gonzalez does not stand alone.  In fact, it is well established under New York law and elsewhere that imprisonment pursuant to a regularly issued warrant – that is, a warrant that is proper at the time it was issued, notwithstanding subsequent events or disclosures – not only defeats suppression in the criminal context, but also may constitute a privileged detention sufficient to defeat a civil action for false imprisonment.  See Washington-Herrera v. Town of Greenburgh, 101 A.D.3d 986, 988, 956 N.Y.S.2d 487, 489 (2d Dep't 2012); see also Florez v. Broward Sheriff's Office, 270 So. 2d 417, 421-23 (Fla. App. 2019); Outlaw v. City of Meridien, 43 Conn. App. 387, 391-94, 682 A.2d 1112, 1115-16 (1996).  In that sense, the "good faith" exception to suppression in a criminal case by reason of a facially valid warrant may be equally applicable to the common law tort of false imprisonment.[11]

---

[11] A federal claim for false imprisonment under § 1983, although derived from the common law tort, is not necessarily co-extensive with the common law tort.  See generally Kee v. City of New York, 12 F.4th 150, 162-65 (2d Cir. 2021) ("favorable termination" required for malicious prosecution under § 1983 has a different meaning than under New York common law).  However, in this case, since plaintiff's claim is wholly based on a violation of a New York statute, there is no reason to apply a different rule for his § 1983 claim than he would obtain under state law.

Of course, it depends on the facts – as Gonzalez points out, the detention cannot have occurred by reason of "misconduct or malfeasance." Gonzalez, 165 A.D.3d at 765, 85 N.Y.S.3d at 525. In the instant case, it is undisputed that the reason why plaintiff was held an extra 17 days was neither. City Corrections could validly rely on the outstanding warrant as a reason to continue the hold on plaintiff, and its policy of requiring lifting of the warrant prior to release is not constitutionally infirm just because it went wrong in this particular instance.

In addition, plaintiff and the McDay cases confuse the statutory 15-day preliminary hearing requirement under New York law with the due process requirements under the Constitution. Although the 15-day hearing is referred to in New York law as a "due process hearing" – because it will satisfy the Supreme Court's due process requirements as stated in Morrissey v. Brewer for a preliminary hearing "as soon as is convenient" – there is nothing magical about the 15 days.

The New York Court of Appeals expressly rejected Morrisey's "as soon as is convenient" standard in favor of the fixed 15-day rule in Exec. Law § 259-i. See People ex rel. Matthews v. New York State Div. of Parole, 95 N.Y.2d 640, 643, 744 N.E.2d 1149, 1150 (2001). That Court has also held that failure to abide by that 15-day requirement "violates the parolee's right to due process unless [State Parole] is able to establish that it could not conduct a hearing because the parolee was beyond its convenience and practical control." Id. (cleaned up). But the state court obviously could not reject the Supreme Court's decision on the minimum requirements of the United States Constitution; what it was holding, in effect, was that the 15-day requirement under Exec. Law § 259-i was more protective of defendants than the standard set forth in Morrisey.[12]

---

[12] In any event, this Court is not bound by a state court's determination of constitutional minimums.

It often is.  Unlike Exec. Law § 259-i, the "convenience" standard in <u>Morrisey</u> allows courts to consider not only the need of the defendant for a prompt preliminary hearing, but the administrative needs of the parole authority in scheduling it.  Thus, the Ninth Circuit has suggested that there is no constitutional violation even where defendants have gone longer without a preliminary hearing than the 17 days plaintiff went without one here.  <u>See</u> <u>Pickett v. Allen</u>, 528 F. App'x 714, 715 (9th Cir. 2013) (18 days not too long for preliminary hearing); <u>Pierre v. Washington State Board of Prison Terms and Paroles</u>, 699 F.2d 471, 473 (9th Cir. 1982) ("[S]ince the on-site [preliminary] hearing was conducted only 21 days after appellant's parole was suspended, it was prompt enough to qualify as the preliminary probable cause determination required by <u>Morrisey</u>."); <u>see</u> <u>also</u> <u>State v. Myers</u>, 86 Wash. 2d 419, 545 P.2d 538 (1976) (en banc) (revocation hearing within 30 days satisfies <u>Morrisey</u>).

The bottom line is that <u>Morrisey</u> does not create a hard and fast rule of what is too long, but rather requires a balancing test that considers all of the facts and circumstances of the parolee's particular case.  This means that violation of the 15-day requirement in Exec. Law § 259-i does not automatically render the warrant void for purposes of a § 1983 claim, nor does it automatically give rise to a false imprisonment action.  Here, where plaintiff's 17-day overdetention was due solely to human error within State Parole, there is no constitutional violation.

## V

Plaintiff's claim also fails because, to meet the test under <u>Monell</u>, although the policy at issue need not be the sole cause of the constitutional deprivation, a plaintiff must demonstrate that, "through its *deliberate* conduct, the [governmental entity] was the 'moving force' behind the injury alleged."  <u>Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown</u>, 520 U.S. 397, 404

(1997) (emphasis in original).  Inherent in this principle is "the concept that the plaintiff must show 'a direct causal link between a . . . policy or custom and the alleged constitutional deprivation.'"  Outlaw v. City of Hartford, 884 F.3d 351, 373 (2d Cir. 2018) (quoting City of Canton v. Harris, 489 U.S. 379, 385 (1989)).  To prevent § 1983 from drifting towards *respondeat superior*, this is an exacting standard.  "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  Board of County Com'rs of Bryan County, Okl., 520 U.S. 397, 405 (1997).

Here, plaintiff's overdetention was not directly caused by the policy of not releasing a parolee until the parole warrant is formally lifted.  Indeed, if State Parole had merely adhered to that aspect of its policy through which it vacates parole warrants when the parolee has not had his 15-day hearing, plaintiff would have been timely released.  The problem is that, as a result of human error – the transmittal of the paperwork without the VORR – State Parole *deviated* from its policy.  The steps that State Parole took to straighten out that human error cover all the days on which plaintiff was overheld.

The decision in Russell v. Hennepin County, 420 F.3d 841 (8th Cir. 2005), has analogous facts.  There, the plaintiff Russell was unable to make bail after being charged with a state crime.  He was held for state prosecutors by a local custodian, the County Adult Detention Center ("ADC").  Three months later, he pled guilty.  In taking the plea, the court advised him that he would be released immediately pending sentencing, and gave him a direction to "go over to Probation and talk to them and go over everything."

The court clerk, however, misinterpreted the judge's "go over to Probation" directive. The Clerk recorded the judge's statement as a "conditional release." ADC's policy was that for a conditional release, it must have a State Probation Officer authorize the defendant's release. That policy put the plaintiff in a whole different category with ADC. Its policy also required it to check each conditional releasee's computer file daily to see if the Probation Officer had authorized the release, but there was no evidence that it did so.

ADC, therefore, continued to hold him. After repeated inquiry to his ADC corrections officers, the plaintiff finally got a lawyer involved. That lawyer went back to the judge who had taken his guilty plea, and the judge faxed an unconditional release order to the ADC, which ADC implemented within hours. But in total, ADC had held him in custody for six days after he should have been released.

The Eighth Circuit held that plaintiff's § 1983 claim failed because ADC's policy of not releasing a prisoner until a Probation Officer signed off on the release reflected a confluence of human error – the misunderstanding of the court clerk and ADC's failure to do the daily check – not an unconstitutional policy:

> There is no evidence in the record supporting Russell's allegation that ADC policy was the moving force behind his prolonged detention. Indeed, at worst, his detention of six additional days resulted not from the execution of ADC policy but from the failure to assiduously follow the policy. This single instance of allegedly failing to follow official policy may rise to the level of negligence. It does not, however, suffice to establish causation as required to advance a claim of municipal liability under § 1983.

420 F.3d at 849 (citation omitted).

In the instant case, plaintiff contends that what happened to him is not a one-off. He attempts to paint City Corrections' policy as a sieve through which numerous detainees are regularly overheld. He points to the antiquated use of faxes and the three-member sign-off requirement for the Board of Parole; the lack of any specific time constraints on the Board's

29

sign-off; and the lack of any specific directives to prevent what happened here.  He asserts that what happened to him is an accident waiting to happen to all detainees in his position, and that it often does happen.

It is the right argument.  As the Russell court noted, to have prevailed, the plaintiff had to "show that his alleged injury was caused by municipal employees engaging in a widespread and persistent pattern of unconstitutional misconduct that municipal policymakers were either deliberately indifferent to or tacitly authorized."  Id.  It was because of Russell's "fail[ure]to produce any evidence that this policy, which is not unconstitutional on its face, caused his prolonged detention," id., that the Eighth Circuit affirmed summary judgment.

Although plaintiff has made the right argument, he has not produced sufficient evidence for a reasonable jury to find "a widespread and persistent pattern of unconstitutional conduct." His evidence consists of the following: (1) the McDay cases; (2) unidentified representatives of State Parole and City Corrections told plaintiff's lawyer that it takes "five-to-seven days" for a parole warrant that the State has elected to cancel to be released, and SPO Hogan testified that it can take a week to ten days to get authorization from the Parole Board; and (3) state courts "are littered with habeas corpus motions and cases seeking compensation where parolees had not been timely released," citing, Gonzalez v. State of New York, 165 A.D.3d 763, 764, 85 N.Y.S.3d 523 (2nd Dep't 2018), and Ryu v. Brann, No. 400074-2020, 2020 N.Y. Misc. LEXIS 7567, at *7 (Sup. Ct. Bronx. Cnty. May 15, 2020) (Westlaw citation unavailable).  None of this evidence, whether viewed singly or collectively, render sufficient support for plaintiff's argument.[13]

---

[13] Plaintiff also relies on an 1815-page document [Dkt. 50-20] which appears to be a list of inmates at Rikers Island with their names redacted, that he contends shows that what happened to him was not an anomaly.  The document was apparently not the subject of any deposition and the Court can make neither heads nor tails of it.  It in no way supports the inference that plaintiff attempts to draw.

McDay happened 15 years ago.  Two cases involving overdetention plus McDay do not reflect a state court docket "littered" with overdetention cases, especially since State Parole issued 17,085 warrants issued in 2018.[14]  That is without considering the fact that the mere commencement of litigation is not nearly the same as judgments in favor of a plaintiff.

In addition, the Gonzalez case dismissed a wrongful imprisonment claim because "[t]he State demonstrated that the claimant was arrested pursuant to a facially valid parole warrant and that the short delay in holding the preliminary hearing was not due to misconduct or malfeasance."  Gonzalez, 165 A.D.3d at 765, 85 N.Y.S.3d at 525.  SPO Hogan's and the unidentified State Parole representatives' estimate of a week or more to get Board approval is belied by the facts of this case (once the correct procedure was implemented); it only took two days to obtain Board of Parole approval to release plaintiff when it received the correct paperwork.

Plaintiff argues that the two days he was overheld after the correct paperwork was sent to the Board of Parole show that even when it works, the procedure is constitutionally porous.  Like the Gonzalez court, however, this Court finds that short periods of being overheld, if that is the usual procedure, do not rise to the level of a constitutional violation.  It cannot be that when the 15-day clock strikes midnight without a release, a detainee accrues an actionable civil rights claim that grows larger and larger by the minute or hour.  There has to be some reasonable allowance to double-check the appropriateness of the release – there are important issues of public safety involved, and even beyond that, the Constitution does not require instantaneous reactions by law enforcement authorities.  As the Eighth Circuit noted in Russell, "ADC policy regarding the monitoring of inmates subject to conditional release reflects deliberate steps by the

---

[14] Department of Community and Corrections Services, 2019 Legislative Report, at Section 3.

ADC to balance the constitutional rights of those prisoners with the protection of their victims and the general public." Russell, 420 F.3d at 850. That is why, in the instant case, the policy requires Board of Parole approval, not just the conclusion of a line officer in City Corrections that release is appropriate. In the absence of proof that the policy results in overdetention with high frequency, it is a reasonable effort to balance an individual's constitutional rights with the needs of public safety.

Moreover, there is no alternative policy and practice concerning this area of overlapping governmental responsibilities that would be immune from the kind of human error that happened here and in Russell. This is well-illustrated by the suggestions that plaintiff offers that in his view would be a constitutionally compliant policy, suggestions that would have to be implemented by injunctive relief. Plaintiff would have a written policy requiring the Board of Parole to review and dispose of all cancelation requests within six hours. Alternatively, or in addition, plaintiff would vest senior parole officers with authority to cancel warrants themselves, without Board of Parole approval, noting that presently, senior parole officers already have that authority, but only up until the time the warrant is executed. He also urges that State Parole should be required to abandon its policy of using faxes to impart information between parole officers and the Board of Parole; he would have "electronic administrative procedures" to track and cancel warrants.

Perhaps these measures would result in some unknown reduction in the unknown number of overholds. Perhaps not. Even if these measures would reduce whatever the number is, they are not foolproof. It is just as easy to miss an emailed notice as a faxed notice (and many faxes these days arrive by email anyway).[15] Letting parole officers or City Corrections Officers

---

[15] Facsimile machines have not yet gone the way of the dinosaur. The Social Security Administration allows, and in some situations mandates, that beneficiaries supply required information by fax. See SSA, "Frequently Asked

instead of the Board of Parole have final say as to who gets released and when might lead to more releases, but it would have to be balanced against the virtually certainty that some parolees would be released who should not be, which raises obvious public safety concerns. Indeed, requiring the Board of Parole to act within six hours of a request from a parole officer wouldn't have helped in this case because of the parole officers' human error, *i.e.*, the forwarding of a defective release package. Mandating a written as opposed to customary policy would also not have solved the problem here because the customary policy would have worked but for the human error.

There may be other measures that would reduce the number of overdetentions, like requiring a telephone call, an email, and a text (as some businesses use to confirm appointments) whenever there is a change in a parolee's detention status. But the Constitution does not require the "best", and courts should not casually mandate their own suggestions for improvements absent a persistent and serious problem.

As the Second Circuit recently noted in Lucente v. County of Suffolk, 980 F.3d 284, 297-98 (2d Cir. 2020), "there must be 'sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse.'" Id. (quoting Jones v. Town of East Haven, 691 F.3d 72, 82 (2d Cir. 2012), and citing Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983) (acknowledging that inaction may lead to municipal liability for the "persistent failure to discipline subordinates who violate civil rights" as it can "give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of Monell")). "It is only at that point that, although

---

Questions," https://www.ssa.gov/ere/faq.htm?tl=2%2C8%2C10%2C13%2C17 (last visited May 4, 2023) ("Once you receive the request letter, simply fax the letter with the records or information requested to the fax number that appears on the letter."). And until relatively recently, Circuit Court judges often conducted case discussions by faxed memo.

not expressly authorized, the unconstitutional conduct is so persistent and widespread that it can constitute a custom or usage of which a supervising policymaker must have been aware." Lucente, 980 F.3d at 298.

The touchstone of most constitutional law is, after all, "reasonableness," and that is certainly true under the Fourth Amendment, which uses the term's antonym expressly.  See Lauro v. Charles, 219 F.3d 202, 211 (2d Cir. 2000) ("[T]he reasonableness requirement of the Fourth Amendment applies not only to prevent searches and seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the manner and scope of searches and seizures that are carried out." (citation omitted)).  There seems nothing unreasonable, in a situation involving the agencies of different public entities that must coordinate parole releases, about a practice and policy that requires Board of Parole consent to the lifting of an executed warrant and communication of that act to City Corrections.  It is a logical and presumptively effective means of balancing parolees' interest in avoiding overdetention and the public's interest in avoiding premature release.

The fact that it did not work for this plaintiff on one occasion shows no flaw in the policy and practice.  Again, if plaintiff had shown that the application of these policies is rife with error and lead to repeated unwarranted detentions, then these agencies would have notice that they (or a court in the absence of action by them), must come up with something better.  That is not the case on this record.

**CONCLUSION**

Defendants' motions for summary judgment are granted, and plaintiff's motion for summary judgment is denied.  The Clerk is directed to enter judgment, dismissing this case.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
       May 5, 2023